479 F.2d 726
 UNITED STATES of America
v.
David HECKMAN et al.
Appeal of David HECKMAN, in No. 72-1713.
Appeal of Robert RUNDLE, in No. 72-1714.
Appeal of James HEINEY, in No. 72-1715.
Appeal of John D. VITO, in No. 72-1716.
 Nos. 72-1713-72-1716.
 United States Court of Appeals,
Third Circuit.
 Argued March 22, 1973.
Decided May 30, 1973.
 
 Mark D. Schaffer, David Rudovsky, Defender Ass'n of Phila., Philadelphia, Pa., for appellants in Nos. 72-1713/72-1715.
 Justin Kevin McCarthy, McCarthy & McCarthy, Bethlehem, Pa., for appellant in No. 72-1716.
 Robert E. J. Curran, U. S. Atty., Robert N. deLuca, Asst. U. S. Atty., Philadelphia, Pa., for appellee.
 Before SEITZ, Chief Judge, and ALDISERT and ADAMS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 Appellants David Heckman, James J. Heiney, Robert T. Rundle, and John D. Vito were indicted, tried, and convicted of conspiracy to violate certain provisions of the Organized Crime Control Act of 1970[1]-in particular, to damage and destroy power lines, a railroad junction, the Bethlehem Steel Homer Research Laboratory, and the Bethlehem Steel plant in Bethlehem, Pennsylvania.[2]
 
 
 2
 From the evidence adduced at trial, the following facts appear. In June, 1971, Donald P. Murphy, Sr., a government informer and a key witness in this case, moved from Pittsburgh to the Allentown-Bethlehem area of Pennsylvania. During the summer, Murphy, who held himself out to be a member of a branch of SDS (Students for Democratic Society), successfully established a militant requtation and won the confidence of some young people, including appellants Heckman and Heiney. In August, 1971, Murphy moved into a house in Bethlehem where Heckman, Heiney and several other persons were living.
 
 
 3
 Murphy testified at trial that on August 28, 1971, Heiney and Heckman discussed with him the possible destruction by explosives of power lines, a railroad junction, and property of Bethlehem Steel. During the course of this conversation, Heiney stated that he had reconnoitered the Bethlehem Steel plant and laboratory, and Heckman indicated that Bethlehem Steel's security was poor. Heiney also said that he could get the "stuff" (dynamite) for any plans. Murphy stated at this point, however, that he "was associated with the Weather Underground and we had bigger plans and not to take any independent actions like that."
 
 
 4
 Murphy further testified that Heckman and Heiney said they would take no independent action and that he knew they believed him because they entrusted him with the care of explosives. According to him, Heckman and Heiney said they would "wait a while." Two days later, while walking with Murphy, Heckman pointed out the location that he thought was the best place to blow up the railroad tracks adjacent to the Bethlehem Steel Works.
 
 
 5
 Murphy later met with local and federal law enforcement officials to request the assistance of undercover agents. On September 23, Ronald Coppoletta, a special agent from the Alcohol, Tobacco, and Firearms Division of the Treasury Department, was introduced to Heckman and Heiney as Steve Fine, a member of "Weather Underground." During a meeting at which Heckman, Murphy, Heiney and Coppoletta were present, Murphy informed Coppoletta of his previous discussions with Heckman and Heiney and Coppoletta responded "that there was to be no independent actions, that bigger things were planned, and it would just make a lot of trouble for everybody." Coppoletta stated that "Weather had an atomic reactor somewhere in Pennsylvania they were interested in." According to Coppoletta's testimony, Heckman and Heiney agreed to "take no action without notifying me." They also agreed to give him dynamite "to be used for targets that they intended to blow up and the targets that I alluded to that Weathermen wanted to blow up."
 
 
 6
 Heiney, Heckman, Coppoletta and Murphy met again on September 27. Appellant Vito arrived at the meeting and said that he had four sticks of dynamite and would give three sticks to the group. According to Murphy, Vito said that he did not want any money for the dynamite as long as it was "used against the establishment."
 
 
 7
 The next day Heckman led Murphy and Coppoletta to lower Saucon Park where they found three sticks of dynamite wrapped in a plastic container and placed in a garbage can. Murphy retrieved the three sticks of dynamite and gave them to Coppoletta.
 
 
 8
 On October 4, according to the testimony of undercover agent Coppoletta, Robert Rundle showed Heiney and Coppoletta where he had hidden seventeen sticks of dynamite. Because Rundle refused to transport the explosives himself, he asked Coppoletta to drop him off before Coppoletta returned for the dynamite. During the ride, Heiney told Rundle that the dynamite would be used for the "movement." Rundle responded that "he didn't care what we did with [the dynamite]," that he just "wanted to be rid of it."
 
 1.
 
 9
 The appellants[3] concede, arguendo, and in any event we conclude, that the government has proved an agreement sufficient to satisfy the elements of a criminal conspiracy to destroy power lines, a railroad junction, and property of Bethlehem Steel (hereafter Conspiracy I). They also concede that the government has proved the overt acts charged in the indictment. They argue, however, that the evidence was insufficient to prove that the overt acts were carried out in furtherance of Conspiracy I, the single conspiracy charged in the indictment. Appellants contend that the overt acts were in furtherance of a completely different conspiracy not charged in the indictment, a conspiracy to destroy a nonexistent nuclear power plant (hereafter Conspiracy II), an alternate plan urged upon them by Murphy and Coppoletta. In short, it is the appellants' theory that Conspiracy I was abandoned at the insistence of Murphy and Coppoletta, and that all overt acts committed thereafter were in furtherance of Conspiracy II, a conspiracy that was not charged in the indictment.
 
 
 10
 Under the abandonment or withdrawal doctrine of the law of conspiracy, a defendant is not punishable as a member of a conspiracy if he withdraws before an overt act is committed.[4] As Judge Friendly has described the concept in the context of a statute of limitations problem:[5]
 
 
 11
 "The Supreme Court last spoke comprehensively on withdrawal from a conspiracy in the opinion of Mr. Justice McKenna for five Justices in Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912)-the four dissenters not reaching this issue. It laid down rigorous requirements for making out the defense of withdrawal from a conspiracy . . . . 'Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law.' Mere cessation of activity is not enough to start the running of the statute; there must also be affirmative action. . . . And the burden of establishing withdrawal lies on the defendant."
 
 
 12
 Examining the evidence in the light most favorable to the Government, as we must since the jury found against the defendants,[6] it is clear that sufficient evidence existed for the jury reasonably to determine that Heckman and Heiney merely put off temporarily their plans to destroy powerlines, a railroad junction, and property of Bethlehem Steel and that they did not affirmatively withdraw from Conspiracy I. Although the Government informer, Murphy, may well have persuaded Heckman and Heiney not to put Conspiracy I into effect immediately, nothing in the record would require the jury to conclude that the appellants abandoned their plans entirely. Indeed, two days after the discussion during which Heckman and Heiney revealed to Murphy their agreement concerning Conspiracy I, Heckman showed Murphy the location that he thought was the best place to destroy the railroad tracks adjacent to the Bethlehem Steel Works.
 
 
 13
 Aside from the other overt acts relating to the collection of dynamite, which, as we hold, the jury could reasonably have found to be in furtherance of Conspiracy I, Heckman's act of pointing out the best location for the destruction of railroad tracks was an overt act sufficient to support the conclusion that the essential elements of a criminal conspiracy were fulfilled. Moreover, nearly one month later, the plans for the destruction of the Bethlehem Steel property and the Homer Research laboratories were discussed by Heckman and Heiney with Murphy and undercover agent Coppoletta. Murphy also testified that as late as November and December of 1971, three to four months after their initial discussion concerning Conspiracy I, Heckman and Heiney still desired to carry out their own actions and were becoming "impatient" waiting for "Weather" and the completion of Conspiracy II. While Coppoletta may have suggested destroying an atomic reactor instead, the jury was not compelled to find that the appellants abandoned their plans to put Conspiracy I into effect merely because government agents urged an alternative.
 
 
 14
 Under these circumstances, sufficient evidence existed for the jury to conclude that the appellants did not abandon their plans or withdraw from Conspiracy I and that the overt acts proved were in furtherance of that conspiracy.
 
 2.
 
 15
 The appellants attack the trial judge's limitation of cross-examination of Murphy and the trial judge's refusal to grant a mistrial because of certain comments by Government witnesses.
 
 
 16
 In general, a witness may not be cross-examined for impeachment purposes as to specific acts of misconduct that did not result in any criminal convictions. Appellants claim, however, that Murphy "opened the door" to cross-examination concerning his prior arrests by denying, in the following direct examination, any "involvement" with the law subsequent to a conviction in November, 1959:
 
 
 17
 "Q. Since November of 1959 have you had any other involvement with the law-
 
 
 18
 "A. Not at all.
 
 
 19
 "Q. -as far as being a defendant is concerned?
 
 
 20
 "A. No."
 
 
 21
 From the context in which Murphy was testifying it was not unreasonable for the district judge to conclude that Murphy was referring only to his conviction, not his arrests. Therefore, it was not improper for the trial judge to limit cross-examination by defense counsel for impeachment purposes to Murphy's conviction or convictions.
 
 
 22
 The appellants also claim that on several occasions during the trial, government witnesses alluded to criminal conduct by the appellants unrelated to the case at bar, and that in view of these statements the trial judge erred in refusing to grant a mistrial. Of the comments objected to, only one merits consideration here.
 
 
 23
 During direct examination, Murphy stated that when introducing appellant Vito to "Steve Fine" (undercover agent Coppoletta), Murphy said to Vito: "You did a good job on firebombing the lower Saucon Municipal Building." The trial judge denied a motion for a mistrial, but immediately instructed the jury to "please disregard that statement."
 
 
 24
 The appellants argue that this Court's recent decision in United States v. Gray[7] mandates reversal in this case. Gray, however, imposed no automatic rule requiring district judges to grant mistrials whenever evidence concerning a defendant's prior alleged misconduct is blurted out at trial. The question asked by the prosecutor in Gray-"You say your wife was killed. You killed her, didn't you?"-was such "grievous plain error," had such a "devastating impact" upon the minds of the jurors, and was even deemed by the trial judge in that case to be so "highly prejudicial," that this Court was constrained to conclude that "[n]o cautionary instruction could purge the jury's mind and memory of the devastating impact of the question . . ."[8]
 
 
 25
 In the present case, on the other hand, the statement was not such as would "irretrievably [sear] itself into the conscious and subconscious minds of the jury."[9] The trial court, which was in the best position to observe the effect of Murphy's statement on the jury, expressly found "nothing prejudicial thus far" and cautioned the prosecutor to "be extremely careful in this area." We conclude that the prompt cautionary instruction given by the trial judge adequately cured whatever damaging impact this comment may have had and that the trial court did not, therefore, abuse its discretion in refusing to grant a mistrial.
 
 3.
 
 26
 Rundle and Vito claim that the evidence was insufficient to show that they knew of, or agreed to, the common plan forming the basis of the agreement between Heckman and Heiney to destroy powerlines, a railroad junction, and property of Bethlehem Steel.
 
 
 27
 The testimony demonstrated that Vito agreed to give Heckman and Heiney three sticks of dynamite, stating that he did not want payment for them so long as they were "used against the establishment". The next day, Heckman said he knew where the dynamite was. He led Murphy and Coppoletta to Lower Saucon Park where they picked up three sticks of dynamite left for them in a garbage can.
 
 
 28
 Murphy testified that Rundle offered to show the group where he had hidden some seventeen sticks of dynamite and that later Heiney stated that Rundle had shown Coppoletta and him where the dynamite was located. Agent Coppoletta testified that before picking up the dynamite, Heiney told Rundle that "we were going to use this for the Movement, that there were no guerrillas in the Lehigh Valley, and we appreciated the dynamite from him and this was going to further the Movement." Rundle responded that "he didn't care what . . . we did with it, he wanted to be rid of it."
 
 This Court has stated:
 
 29
 "Once the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it."[10]
 
 
 30
 Although the evidence as to Vito and Rundle is hardly overwhelming, still the evidence showed that they had turned over dynamite to the other conspirators knowing that those explosives would not be used by the other defendants in a lawful manner. Rundle was told the dynamite would be used illegally, and he stated he did not care. Vito conditioned his gift upon the stipulation that it be used in an illegal manner-against the establishment. Thus, there was sufficient evidence for the jury reasonably to infer that both Rundle and Vito were aware of the general purpose of the conspiracy, agreed to aid the other conspirators, and acted in furtherance of the unlawful agreement.
 
 4.
 
 31
 The appellants further urge upon this Court a number of other grounds for reversal, none of which we find meritorious. Vito claims that the trial judge improperly admitted as to him hearsay statements of Heckman under the co-conspirator exception to the hearsay rule. The general principle is that such statements are admissible only when it is shown that a conspiracy existed and that a particular defendant is connected to it. It is clear, however, that independent of such hearsay statements the Government showed Vito's connection with the conspiracy by proof aliunde, as required by Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1942).
 
 
 32
 Vito also asserts that the prosecutor should not have been permitted to ask Vito's character witness whether he "had heard that on June 12, 1968, Mr. Vito was cited for contempt of court by the Court of Common Pleas of Lehigh County," because there was no showing of a factual basis for the inquiry. It is apparent, however, from the form of the prosecutor's question, that the trial judge could reasonably have found that there was a factual basis for the inquiry and, in any event, the defendant did not specifically question this point at trial. In addition, it cannot fairly be disputed that the question was relevant in the context of the examination. The trial court did not abuse its discretion in allowing it. See Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L. Ed. 168 (1948).
 
 
 33
 Finally, appellants urge this Court to adopt a rule generally requiring the recording of grand jury testimony. Upon the Government's answer that the testimony was not recorded, the trial judge denied the appellants' pretrial motion for production of the grand jury proceedings and in the alternative for dismissal of the indictments. The trial judge did not err in this ruling. Rule 6(d) of the Federal Rules of Criminal Procedure permits, but does not require, the recording of grand jury testimony.[11] The appellants have not suggested that the non-recording of grand jury proceedings generally violates due process nor have they attempted to show that the non-recording prejudiced them in this particular case. Under these circumstances, we perceive no basis for imposition, at least by this panel, of such a recording requirement.
 
 
 34
 An order will be entered affirming the judgment of the district court.
 
 
 
 [1]
 18 U.S.C. Sec. 844(i). The parties stipulated to the interstate commerce element of the statute
 
 
 [2]
 Heckman, Heiney, and Rundle were each sentenced to indeterminate prison terms under 18 U.S.C. Sec. 5010(b) until release under Sec. 5017(c). Vito was committed to the custody of the Attorney General for a period of three years, six months to be served in a jail-type institution, and the remaining time to be placed on probation
 
 
 [3]
 Heckman, Heiney, and Rundle filed a joint brief in which this concession was made. Vito filed a separate brief and argues not that the government failed to prove the existence of a criminal conspiracy, but that the evidence was insufficient to show his connection to any conspiracy that may have existed
 
 
 [4]
 See Developments in the Law-Criminal Conspiracy, 72 Harv.L.Rev. 920, 957-60 (1959)
 
 
 [5]
 United States v. Borelli, 336 F.2d 376, 388 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), quoting Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)
 
 
 [6]
 United States v. DeCavalcante, 440 F.2d 1264, 1273 (3d Cir. 1971); United States v. Weiss, 431 F.2d 1402, 1407 (10th Cir. 1970)
 
 
 [7]
 468 F.2d 257 (3d Cir. 1972) (en banc)
 
 
 [8]
 Id. at 259
 
 
 [9]
 Id. at 259-60
 
 
 [10]
 United States v. Cohen, 197 F.2d 26 (3d Cir. 1954); accord United States v. Weber, 437 F.2d 327, 336-37 (3d Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971)
 
 
 [11]
 Accord United States v. Hensley, 374 F.2d 341 (6th Cir.), cert. denied, 388 U.S. 923, 87 S.Ct. 2139, 18 L.Ed. 1373 (1967); United States v. Cianchetti, 315 F.2d 584 (2d Cir. 1963); see United States v. Franklin, 429 F.2d 274 (8th Cir.), cert. denied, 400 U.S. 967, 91 S.Ct. 380, 27 L.Ed. 387 (1970). But see United States v. Gramolini, 301 F.Supp. 39 (D.R.I.1969)