**UNITED STATES of America**

v.

**Arthur S. LOWELL, Appellant.**

**No. 80–2057.**

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 1981.

Decided May 8, 1981.

As Amended on Denial of Rehearing and Rehearing In Banc July 10, 1981.

Nathan Lewin (argued), Steven A. Reiss, Miller, Cassidy, Larroca & Lewin, Washington, D. C., for appellant.

William W. Robertson, U. S. Atty., Newark, N. J., Frank J. Marine (argued), Atty., Dept. of Justice, Washington, D. C., for appellee; K. William O'Connor, John Klein, Attys., Dept. of Justice, Washington, D. C., of counsel.

Before SEITZ, Chief Judge, and ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal centers on the conviction of the appellant, Arthur S. Lowell, for participation in a bribery conspiracy in violation of 18 U.S.C. § 371 (1976) involving a government contractor, Atlas Paint and Varnish Company, and the General Services Administration (GSA). Lowell was tried to a jury and convicted, along with his codefendant, Anthony Pionzio, in the United States District Court for the District of New Jersey; the codefendant was also convicted on several counts of violating the Travel Act, 18 U.S.C. § 1952(a)(3) (1976). Lowell alone appeals from his conviction and presents a two–pronged attack on the weight and probative value of the evidence upon which the jury found him a conspirator before and after the statute of limitations "cutoff" point, July 12, 1974. We affirm.

### I.

Atlas Paint and Varnish Company (Atlas), a small manufacturer of paint owned and operated by the Tepperman family, sold its product almost exclusively to the federal government. Dennis Tepperman, who had worked at Atlas since 1962, became president in 1969 upon the death of his father, Meyer Tepperman. At that time, Dennis's mother Bunnie became the sole stockholder. About a year before, government dissatisfaction with Atlas contract compliance both as to time of delivery and quality of product had prompted Meyer to engage Arthur Lowell, a lawyer experienced in representing government contractors before GSA, to represent Atlas in its dealings with GSA. When Meyer died, Lowell remained in Atlas's employ. Aside from handling administrative litigation and negotiation with GSA, Lowell devoted one night per week to directing Atlas staff meetings. At these weekly meetings, Atlas's substantial production and quality problems were exposed and remedial measures directed. Lowell also recruited or helped to recruit Michael Foncellino and Thomas Accamondo, the two employees who, next to Dennis Tepperman,

ultimately exercised the most responsibility for running Atlas. Foncellino, new to the paint business, joined Atlas in early 1970; Accamondo, a paint chemist, joined in July 1971.

Lowell, disappointed in his efforts to secure an equity interest in Atlas following Meyer Tepperman's death, severed his connections with Atlas toward the end of 1971. Finding Dennis Tepperman unable to convince his mother to allow Lowell to become a part owner of Atlas, Lowell delivered an ultimatum, in effect, in October of 1971. Either Bunnie would cut Lowell in for a share of equity participation in Atlas, or Foncellino, the newly-hired Accamondo, and her son would have to operate the company without him. The three officers, upset about Atlas's diminished prospects for success without Lowell's participation, pleaded for his retention. Bunnie, however, was adamant. In early 1972 Lowell received his last check from Atlas and terminated his employment. Dennis Tepperman, Foncellino, and Accamondo took charge.

Having described Lowell's relationship to Atlas, we turn to certain details of Atlas's operation that explain the motivation for bribery in this case. Although Atlas dealt with government offices located throughout the country, monitoring the quality of its product was the special responsibility of the New York City offices of GSA's vast bureaucracy. The Quality Control Division of the Federal Supply Service, Region II, performed this monitoring function together with GSA's New York laboratory. A related quality control bureaucracy existed in the Federal Supply Service's central office in Arlington, Virginia.

Quality monitoring of each Atlas shipment could be performed by GSA's New York laboratory, or, at GSA's option, by Atlas itself. The latter alternative, also known as the "Quality Assurance Manufacturers Program" (QAMP) afforded Atlas significant advantages in meeting delivery obligations to the procuring agencies. New York employees of the GSA had a certain input into the decision whether to permit Atlas into QAMP or to reject it. As might

be expected, the legitimate criteria for participation had a great deal to do with Atlas's record on self-monitoring. Discrepancies between Atlas paint and government paint specifications could be discovered by the recipients of the paint or by the New York offices themselves in periodic inspections and laboratory tests of Atlas paint.

Early in 1972 Tepperman told Foncellino and Accamondo they were to make monthly payments to two of the GSA employees with responsibility for monitoring Atlas's continued eligibility for QAMP participation. Further, he advised them that such a scheme met with (the then-retired) Lowell's approval. For the next five years, Foncellino made monthly payments of $250 to Tony Pionzio, a supervisor and later a "branch chief" in the Region II Quality Control Division. Accamondo made monthly payments of $100 to Joe Montalbano, a chemist in the paint section of GSA's New York laboratory. Pionzio and Montalbano also received Christmas gifts, including gifts of money, during this same period. In spring of 1977, fears of detection caused by rumored investigations within GSA, and involving Pionzio himself, caused the three Atlas officers to terminate the series of payoffs at issue in this case.

In early 1979, federal investigators interrogated Tepperman, Foncellino and Accamondo. The three were granted use immunity in exchange for their complete cooperation with the Government in its pending investigation and prospective prosecution "involving employees of General Services Administration and Arthur S. Lowell." Subsequently, on July 12, 1979, Lowell, Pionzio and Montalbano were indicted for conspiracy to defraud the United States,

violations of the Travel Act, and obstruction of justice.[1] The indictment described a conspiracy beginning in November 1969 and lasting until March 1977 in which Lowell, Pionzio and Montalbano conspired with each other, with Dennis Tepperman, Foncellino and Accamondo, and with other unknown persons to defraud the United States.[2] Because the statute of limitations for the conspiracy charge was five years, it was crucial that the conspiracy charged existed after July 12, 1974, and (for purposes of this appeal) that Lowell's part in the conspiracy had not been completely terminated by withdrawal prior to that date. With respect to the timing of Lowell's participation, the indictment alleged that: (1) Lowell "was employed by Atlas Paint and Varnish Company from April 1968, until December, 1971"; and (2) "In furtherance of the conspiracy ... [i]n and around March, 1977, [Lowell] spoke on the telephone with ... Foncellino."

Although Lowell and Pionzio were tried before Judge Whipple on the conspiracy and Travel Act counts,[3] Montalbano pleaded guilty and was sentenced in separate proceedings by District Judge Stern. Upon conviction, Lowell and Pionzio filed post-trial motions for acquittal and for a new trial which were denied. 490 F.Supp. 897 (D.N. J.1980). Only Lowell appeals.

## II.

The focal point of this appeal is the statutory "cutoff" point, July 12, 1974. The jury's sole ground for linking Lowell to the conspiracy in the pre-cutoff period came from the lips of Dennis Tepperman, whose testimony could be suspect for a number of reasons. Tepperman, professing ignorance

---

1. All three were charged with conspiracy. Only Pionzio and Montalbano were charged with Travel Act violations. Only Lowell was charged, under 18 U.S.C. § 1510(a) (1976), with obstruction of justice.

2. Count I of the indictment read as follows:
 Beginning on or about November, 1969, and continuing to March, 1977, in the District of New Jersey, ARTHUR S. LOWELL, ANTHONY PIONZIO and JOSEPH MONTALBANO, the defendants herein did unlawfully

... conspire, and agree together with each other, and with Dennis Tepperman, Michael Foncellino, and Thomas Accamando, named as coconspirators but not as defendants herein, and with diverse other persons to the grand jury unknown, to defraud the United States Government....

3. On Pionzio's motion, Lowell's obstruction of justice charges were severed from the joint trial. They are still pending.

of the existence of any bribery prior to his succession to the presidency of Atlas, described his first day at work after his father's (Meyer's) death in November 1969. He testified that Lowell told him then, for the first time, that Meyer and Lowell had been making payoffs to two GSA employees and "that would have to continue." The two recipients were said to be Roger Carroll, an official in the central office of the Federal Supply Service (ultimately serving as Assistant Commissioner for Standards and Quality Control), and Sidney Friedman, the Region II employee ("quality control representative" or "quality assurance specialist," also referred to at trial as inspector), whose job it had been, almost until the time of Meyer's death, to visit the Atlas plant at least once a week. According to Dennis Tepperman, the Friedman payoff was made in one lump sum to cover several monthly payments that had been owed him since prior to Meyer's death. Tepperman testified that he overheard Lowell attempting to persuade Friedman to accept the money and was later told by Lowell that Friedman had accepted it. Tepperman further testified that the Carroll payoffs were given to Lowell at the rate of $500 per month.

Tepperman also testified that in either 1970 or 1971, Lowell told him that Pionzio and Montalbano would have to be paid off.[4] Thereafter, according to Tepperman, Lowell received the Pionzio payoffs from Tepperman at the rate of $250 per month, with a $500 bonus for Christmas, and the Montalbano payoffs at $100 per month, with a $100 Christmas bonus. It is undisputed that Lowell made no payments to Carroll, Pionzio or Montalbano beginning soon after the impasse in 1971 between Lowell and Bunnie. However, Dennis Tepperman testified that after Lowell's announcement of his intention to leave Atlas, the two had a conversation in which Lowell stated "that in order to stay in this business, I [Tepperman] would have to continue these payoffs. That is the way you do business in GSA.... He [Lowell] said that in order to help me out, he would take the money and help me out until the end of the year including, you know, Christmas." Tepperman testified that he accepted Lowell's offer and gave him money to pay Carroll, Pionzio and Montalbano through the end of 1971. Later, said Tepperman, he decided to keep on paying Pionzio and Montalbano, but not Carroll.

Thus ends the testimony—all relating to pre-1974 acts—linking Lowell directly with the operation of the payoff scheme. Other evidence, insufficient in itself to tie Lowell to the conspiracy, was introduced to show Lowell's post-1974 involvement with the conspirators and his consciousness of guilt. Foncellino testified that Lowell told him in March 1977 "that I [Foncellino] have to be very careful, there are a lot of investigations going on.... Tony Pionzio is being investigated." Foncellino, believing from conversations with Tepperman that the payoff scheme was Lowell's brainchild, "went up to Dennis and told him that I [Foncellino] think Arthur is telling me that we better stop the payments."

Tepperman also testified that Lowell called him in February 1979, asking whether government agents had contacted Tepperman in connection with an investigation of Lowell, and volunteering advice on whether or not Tepperman could, if he wished, invoke the attorney-client privilege with respect to conversations between him and Lowell.[5] Tepperman's notes of these

4. Tepperman testified that Lowell "told me that in order to stay in the government business, there are certain payoffs that you have to make. It is like insurance. He says 'You may not need these people now, but one day, you are going to be in trouble and that is when you call in the favor.'"

5. These phone calls also formed the basis of Lowell's indictment for obstruction of justice. As noted above, trial on those charges was severed from the trial on conspiracy and Pionzio's Travel Act violations. Because the indictment did not charge a separate conspiracy to conceal the 1969–77 payoffs, Lowell's 1979 acts were introduced not as acts in furtherance of the charged conspiracy, see Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), but as acts indicating "consciousness of guilt."

conversations with Lowell were also introduced.

As the trial court recognized, Lowell's 1977 phone conversation with Foncellino was, by itself, insufficient as a matter of law to support a conspiracy conviction. *See Roberts v. United States*, 416 F.2d 1216 (5th Cir. 1969). Thus it was impossible for the jury to place Lowell within the conspiracy at any time unless it believed Tepperman's testimony beyond a reasonable doubt. Secondly, the Government did not contend that prosecution for a conspiracy to bribe Roger Carroll from 1968 to 1971, if it existed, was not barred by the statute of limitations. Therefore, the jury was obliged to believe Tepperman's testimony that Lowell participated in a conspiracy that included a scheme to pay off either Pionzio or Montalbano or both.

Prior to the trial, however, Montalbano had told both the FBI and Judge Stern (the latter in connection with his guilty plea), that he received payoffs from Accamondo, and Accamondo alone. Lowell sought to elicit this same testimony from Montalbano in his own behalf. Montalbano, having pleaded guilty but awaiting sentencing, refused to testify for fear of self-incrimination. His counsel noted that notwithstanding his guilty plea, Montalbano was still liable to be prosecuted for tax evasion and for substantive acts in the Southern District of New York. Judge Whipple upheld Montalbano's claim of privilege and rejected the use of his prior testimony in any form. The court also refused to order the Government to give Montalbano use immunity and thus allow him to testify without fear of self-incrimination.

Given the crucial importance of Tepperman's testimony concerning Lowell's pre-1972 relationship with Montalbano and Pionzio, Lowell argues that he is entitled to a new trial at which a jury may be exposed to the testimony of Montalbano and Pionzio [6] to rebut Tepperman's testimony. Lowell also argues that the evidence discloses that he withdrew from the conspiracy, if indeed he was ever a participant, prior to 1974, and that his conviction was thus barred by the statute of limitations.

We believe that Montalbano's refusal to testify was privileged and did not, on the basis of the trial record, entitle Lowell to compel the use of Montalbano's testimony, either through immunity or otherwise. Nor can we sustain Lowell's argument that the only permissible conclusion to be drawn from the evidence is that he withdrew from the conspiracy before July 1974. For these reasons we affirm.

### III.

It is sometimes possible, by means of established formulae, to determine that an alleged conspirator has failed to present a sufficient case warranting a factual finding of withdrawal. "Mere cessation of activity is not enough to start the running of the statute...." [7] On the other hand, where fraud constitutes the "standard operating procedure" of a business enterprise, "affirmative action" sufficient to show withdrawal as a matter of law from the conspiracy embodied in the business association may be demonstrated by the retirement [8] of a coconspirator from the business, severance of all ties to the business, and consequent deprivation to the remaining conspirator group of the services that constituted the retiree's contribution to the fraud. *See Glazerman v. United States*, 421 F.2d 547 (10th Cir.), *cert. denied*, 398 U.S.

---

6. After the trial Pionzio, pursuant to a grant of immunity, apparently informed a grand jury that he had never received Atlas payoffs from Lowell. *See* part V *infra*.

7. "[T]here must also be affirmative action, either the making of a clean breast to the authorities, ... or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964), *cert. denied*,

379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); *accord, United States v. Heckman*, 479 F.2d 726, 729 (3d Cir. 1973).

8. In this opinion, we use the terms "retire" and "retirement" in a purely factual sense, denoting the termination of the employment relationship. We use the term "withdrawal" in a legal sense to mark the termination of the conspiratorial relationship.

928, 90 S.Ct. 1817, 26 L.Ed.2d 90 (1970); *United States v. Goldberg*, 401 F.2d 644 (2d Cir. 1968), *cert. denied*, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790, 394 U.S. 932, 89 S.Ct. 1202, 22 L.Ed.2d 461 (1969). Between these polar situations, in which the question of withdrawal can be resolved as a matter of law, there resides an assortment of factual matrices in which the question of withdrawal is for the finder of fact. Because of the similarity that this case bears to *Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), we believe that this case presents such a matrix.

The conspiracy in *Hyde* was a scheme, contrived by Hyde and Benson, to fraudulently manipulate the land-grant programs of California, Oregon and the United States. The two States were willing to sell isolated state-owned tracts ("school sections") amid federally owned lands. The tracts were evidently bargains, but they were not available, either directly or indirectly, to speculators or out-of-staters. The federal government, in turn, was engaged in turning many of its lands into forest reservations, and it gave the owners of such isolated tracts, surrounded by federal reservations, the option of swapping their isolated tracts for other, federally owned tracts of equal size.

Hyde and Benson concocted a plan to make money by purchasing many "school sections" from the States and then buying enough influence in the federal General Land Office to engineer profitable swaps of the school sections under the federal forest reservation program. To accomplish this objective, however, they had not only to bribe Land Office employees, but also to swindle the States of California and Oregon into selling them the school sections. They hired Dimond, a lawyer, to handle the federal government (much as, the Government suggests, Lowell was hired by Atlas). They also hired Schneider to find qualified people to buy the school sections from the States and then surreptitiously and illegally transfer title to Hyde and Benson.

Only Hyde and Schneider were convicted. The applicable statute of limitations was three years, and Schneider contended that because he performed no acts in furtherance of the conspiracy within that period (although others had), and because he had also disclosed the conspiracy to a General Land Office agent prior to the cutoff date, his prosecution was time-barred. Although apparently Schneider claimed that "he had ceased to be in Hyde's employment in any capacity" prior to the cutoff date, *see* 225 U.S. at 370, 32 S.Ct. at 803, the Supreme Court on review of Schneider's conviction did not discuss whether this cessation of employment was, in itself, affirmative action sufficient to "disavow or defeat" the conspiratorial purposes. On the other hand, the Court refused to vacate the conviction on limitation grounds. Thus, although not specifically stating a rule for assessing the impact of retirement on a claim of withdrawal, the Court refused to give retirement the dispositive weight that would be required to acquit Lowell in this case. Said the Court:

> If each conspirator was the agent of the others at the [moment the conspiracy was born,] he remains an agent during all of [its life]. This view does not, as it is contended, take the defense of the statute of limitations from conspiracies. It allows it to all, but makes its application different. Nor does it take from the conspirator the power to withdraw from the execution of the offense or to avert a continuing criminality. It requires affirmative action, but certainly that is no hardship.... As he has started evil forces he must withdraw his support from them or incur the guilt of their continuance.

225 U.S. at 369–70, 32 S.Ct. at 803. In its subsequent discussion, the Court strongly suggested that the question of withdrawal could not be answered solely by reference to Schneider's retirement; post-retirement acts could be considered as indicating "what his attitude of mind toward the conspiracy was"—"whether there was an acquiescence which embraced the later acts." *Id.* at 371, 372, 32 S.Ct. at 803, 804. Having helped set the illegal transactions in motion, a jury could find that Schneider's post-retirement

behavior disclosed an attitude insufficiently repudiatory to constitute "withdrawal" notwithstanding (a) Schneider no longer derived any income from the transactions; (b) he no longer continued to be employed by the principals; and (c) he had given the Government a report on the fraud.

Schneider had conversations with an agent of the General Land Office giving detailed information of the frauds and the manner by which they were accomplished. The agent subsequently reported the matter to the Land Office, but the report had no effect on the Office in its dealings with Hyde and Benson.[9] Schneider argued that his disclosures entitled him to a finding of withdrawal. However, the trial court instructed the jury as follows:

"Now if he [Schneider] had stood by that and had gone on and disclosed all he knew about the matter, and said: 'I will have nothing more to do with this matter,' nothing that could have been done by the others after that could affect him at all. He would have been out of it; he would have repudiated it. *As bearing on the effect of what he did there if you find he did it, you are to consider what he did afterwards.* If, after having made this disclosure as far as he did, he shut his mouth and said: 'I will not say anything more about this matter; the Government shall not get anything more out of me,' that is not an act by him in furtherance of the conspiracy, but it is a piece of evidence to be considered by you as bearing on the question whether he was acquiescent—what his attitude of mind toward the conspiracy was.

"*If he had stood on his disclosure, you might have said: 'Well, he is out of it from now on'—but in connection with that you are to consider what he said afterwards.* If you find that he closed his mouth and refused to say anything more about the matter and kept still in the interest of the others, you would have a right to say that that showed that he was still acquiescent in the matter. It

would neutralize, if you choose to treat it so, the effect of his former declaration, that he did know, and was willing to disclose."

225 U.S. at 371, 32 S.Ct. at 803 (emphasis added). The Supreme Court approved.

The parallel between Schneider's situation in *Hyde* and Lowell's situation here is striking. Although Schneider and Lowell purported to withdraw by different paths— Schneider by unburdening himself to the "authorities" and Lowell by effectively notifying his coconspirators that they would be deprived of his services—the jury in each case was entitled to draw an inference of continued participation from acts (or failures to act) subsequent to retirement from the fraudulent enterprise. Moreover, it is apparent from the events that took place during deliberations in this case that the jury focused on just such post-retirement evidence.

Judge Whipple originally instructed the jury that [f]or a defendant to withdraw from the conspiracy, he must abandon the illegal enterprise in a manner reasonably calculated to reach coconspirators. Mere cessation of participation in the conspiracy is not enough. However, a defendant need not take action to stop, obstruct or interfere with the conspiracy in order to withdraw from it. As long as a defendant severs his connection with the conspiracy in a way that he reasonable expects will notify the other conspirators he is no longer part of their enterprise, a defendant has withdrawn from the conspiracy. If this withdrawal occurred more than five years before the defendant was indicted, he may not be convicted of the conspiracy, even though he at one time was part of it. Unless, within five years of the day in which he was indicted the defendant rejoined the conspiracy and participated in an overt act in furtherance of it.

No specific mention of the 1977 phone call between Lowell and Foncellino was made in

---

**9.** It may be that some of its employees who were in league with Hyde and Benson informed them of Schneider's disclosures. Perhaps this accounted for Schneider's "retirement."

the original jury charge.[10] However, the court charged the jury that "if you do not believe the testimony of Dennis Tepperman, beyond a reasonable doubt, you must find the defendant Lowell not guilty." Thus, the jury knew that the evidence respecting the 1977 phone call could not, by itself, provide the foundation upon which to find Lowell a post-1974 member of the conspiracy.

Several hours after the jury retired to deliberate, it returned with a request for Foncellino's testimony concerning the 1977 phone call and instructions pertaining to its legal effect. Clearly these requests signaled that the jury was contemplating the impact of the 1977 phone call on Lowell's guilt or innocence. Later, the jury posed to the court an additional query requesting "a clarification of the Statute of Limitations, with regard to Mr. Lowell's conspiracy charge," and instruction whether the call constituted only a warning or a "coverup." In response to this last request the court instructed:

A cover up or act of concealment can only be an overt act in furtherance of the conspiracy if the purposes or objectives of the conspiracy have not yet been achieved. Therefore, it is a question of fact for you to determine whether the purposes or objectives of the conspiracy to defraud the Government were achieved by March of 1977. If the purposes or objectives were achieved by March 1977, thereby terminating that conspiracy, then even if you find that the 1977 telephone call was an act of concealment or cover up, nevertheless that telephone call can not be an overt act in furtherance of the conspiracy, under these circumstances the defendant Lowell should be found *not guilty*. However, if the goals or purposes of the conspiracy

were not achieved, and the conspiracy was still in existence in March of '77, then even if you find that the 1977 call was an act of concealment or cover up, you may nevertheless find that the act of concealment furthered the conspiracy or, in other words, that the telephone call was an act or was an overt act, I should say, in furtherance of the conspiracy to defraud the Government. *Under these circumstances the defendant Lowell may or may not be found guilty.*[11]

(Emphasis added). Later the same day, the jury returned its guilty verdict.

Viewing the evidence in the light most favorable to the Government, as we must in light of the verdict, we can only conclude that the jury considered the evidence concerning the 1977 phone call in the manner deemed appropriate in *Hyde.* First, the jury believed Tepperman's testimony that Lowell had, at one time, been a conspirator. Next, the jury believed that the same conspiracy remained in existence at the time of the 1977 phone conversation. Finally, the jury believed that the phone conversation was an act in furtherance of the same conspiracy. Thus, although retired, Lowell had not, in the jury's view, "abandoned the illegal enterprise." This inference was well within permissible limits, for in *Hyde,* the Supreme Court held that Schneider's retirement and disclosure to the authorities could be similarly disregarded by the jury in light of Schneider's subsequent failure to make additional disclosures to the authorities.

The district court therefore was correct in concluding that the reasoning of *Roberts v. United States, supra,* did not require acquittal in the present case. In *Roberts,* the Fifth Circuit held that acts of a non-conspirator, designed to protect her conspirator friends from detection, did not constitute a joining of the conspiracy. However,

---

10. The original jury instructions did discuss the 1979 phone calls. The court noted that "[t]his evidence is relevant to this case only for what it shows, if anything, as to the defendant's consciousness of guilt."

11. There is no suggestion on appeal that the jury impermissibly convicted Lowell of a conspiracy not charged. The court charged the jury:

I further instruct you that the indictment does not charge a conspiracy to conceal or cover up. And that such conspiracy, if one existed, would be different from the conspiracy to defraud the United States, with which these defendants are charged, and I so instruct you.

*Roberts* did not intimate that such evidence was not probative of whether such a person had withdrawn from an assumed prior participation in the conspiracy. Such a reading of *Roberts* is of course impossible because the court there also held insufficient the evidence purporting to show that the accused had been a prior member of the conspiracy. In this case, on the other hand, the jury had sufficient evidence, in the form of Tepperman's testimony, of prior participation.

For different reasons, this case can also be distinguished from *United States v. Goldberg, supra,* and *Glazerman v. United States, supra.*[12] In each of those cases, as in Lowell's case, the jury had evidence that could place a defendant within the conspiracy at some time prior to the period for which each was convicted of participating in the conspiracy. However, in *Goldberg* and *Glazerman,* unlike this case, there was no evidence of post-retirement acts that would support the sort of reasoning in which the *Hyde* jury was permitted to indulge.

As might be expected, the Government argues to this court, as it did in *Goldberg,* that Lowell is guilty of post-1974 conspiracy on the "time-bomb" theory of withdrawal.[13] According to the Government, Lowell can be characterized as the "architect of a scheme of bribery and corruption." We are invited to conclude that Lowell's importance to the conspiracy transcended his role as an alleged "bag-man"; having designed the scheme and targeted Pionzio and Montalbano as willing recipients of payments, mere cessation of employment could not substantially deprive the conspiracy of Lowell's contribution to the joint criminal effort. In view of *Hyde,* however, we need not read so much into the evidence presented at trial in order to uphold the jury verdict of guilty. Moreover, given the substantial cost to the alleged conspiracy in-

12. *Goldberg* involved a boiler room securities fraud conspiracy. The fraud was carried out through the Biltmore Securities Corp. Prosecution of Scheftel, one of Biltmore's salesmen, was held time-barred because he had retired from Biltmore, and thereby withdrawn from the conspiracy, over five years prior to the return of the indictment, even though Scheftel had developed potential targets of the fraud for future use by those who remained at Biltmore.

The *Glazerman* case was a prosecution for conspiracy to defraud by a form of pyramid scheme, through the Oklahoma Brentwood Company, which sold vacuum cleaners. The Company enlisted its customers as referrers of additional customers. Potential Brentwood customers were falsely assured that they could, in this way, earn substantial commissions. The withdrawal question arose because Brentwood's office managers, found guilty on all substantive counts and a conspiracy count, sought acquittal on the substantive counts of the indictment that took place before or after their terms of employment. In each case, the court found that the employee could be found guilty only on those substantive counts occurring during his tenure with Brentwood.

13. The "time-bomb" theory derives, perhaps, from a reference in footnote 8 of the opinion in *United States v. Borelli*:

As was persuasively said in the Solicitor General's brief (p. 79), "When conspirators have set a dynamite machine with a timed fuse in position to blow up a building and go away and leave it to do its destructive work in due course of time, they are continuing in their purpose and are in the actual execution of that purpose every moment of time until the machine explodes."

336 F.2d at 388 n.8. *Borelli* was a prosecution for conspiracy to distribute heroin. Because there were identifiable lots of heroin whose progress through the chain of distribution could be traced, the court tended to view the conspiracy to distribute a single lot as lasting until the lot was finally disposed of. Several conspirators asserted the statute of limitations as a defense because there was no evidence of their activities during the five years preceding indictment. However, since their particular lots of heroin had yet to be disposed of even after the "cutoff date," the court viewed the conspiracies as lasting so long that prosecution was not time-barred. The question remained whether anyone had withdrawn before the lots had been sold. The court found that no conspirator was entitled to a finding of withdrawal as a matter of law. In one instance, a partner in the enterprise, Rosario Mogavero, went to jail before the cutoff date. At a farewell meeting with his delivery man, Rinaldo, Rosario told Rinaldo that in the future he was to take orders from Rosario's brother, Joe, and his other partner, Locascio, just as if the orders were coming from Rosario himself. Later, but before the cutoff date, Locascio and Joe terminated their partnership. Nevertheless, Judge Friendly found that neither Rosario nor Locascio was entitled to acquittal. *Id.* at 389.

volved in Lowell's departure, direct application of the Government's theory in this case would remold and stiffen the law of conspiracy in a way that can little serve to mitigate "the danger to society" to which conspiracy law is addressed.[14] Under the Government's theory no one but a mere functionary in a corrupt enterprise could successfully withdraw by retiring unless he actively obstructed the work of the remaining partners in crime. As the district court correctly held, however, obstruction was unnecessary and the evidence in this case, as in *Hyde*, could have supported a jury find-

ing of withdrawal[15] as well as nonwithdrawal. Moreover, Lowell and the district court are correct in concluding that, absent the 1977 phone call, Lowell would have been entitled to acquittal.[16] But Lowell ignores the "rigorous requirement for making out the defense of withdrawal"[17] applied in *Hyde* in contending that the factual complex here is legally indistinguishable from those in *Goldberg* and *Glazerman*.[18]

## IV.

Rejection of Lowell's withdrawal argument requires us to consider further wheth-

14. "Conspiracy law is designed to address the dangers to society that are inherent in group activity: groups can achieve illegal ends of larger scope and complexity than can individuals; group support dynamics make actual execution of plans more likely; and such concerted efforts prepare participants for 'habitual criminal practices.'" Note, *"Single vs. Multiple" Criminal Conspiracies: A Uniform Method of Inquiry for Due Process and Double Jeopardy Purposes*, 65 Minn.L.Rev. 295, 296–97 (1980) (footnotes omitted). *See also Callanan v. United States*, 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961).

15. First, there is nothing in the evidence to show that Lowell, rather than Meyer or his brother Harry Tepperman, had initiated the first of the illegal payoffs on behalf of Atlas. Dennis Tepperman professed total ignorance as to how, during the time preceding Meyer's death, the pattern of bribery had begun. Second, and more important, Lowell's retirement may well have had an adverse impact on the alleged joint criminal enterprise. The proof of this is plain from the testimony of the Government's own chief witness; in Tepperman's view, Lowell's impending departure in 1971 would leave Tepperman "flat on his face."

A number of cases hold that retirees had not withdrawn simply by retiring, but, due to their particular facts, they do not present the question in the form presented here. *See United States v. Gillen*, 599 F.2d 541, 547–48 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); *United States v. D'Andrea*, 585 F.2d 1351, 1355 n.3 (7th Cir.), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1795, 60 L.Ed.2d 244 (1978); *United States v. Abraham*, 541 F.2d 1234, 1237 & n.3 (7th Cir. 1976), *cert. denied*, 429 U.S. 1102, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977); *United States v. Cohen*, 516 F.2d 1358, 1364–65 (8th Cir. 1975); *Reisman v. United States*, 409 F.2d 789, 792–93 (9th Cir. 1969). In each case, as in this case, the defendant contended that active employment in the enterprise had ceased at some point, therefore enti-

tling him to acquittal. In each case, however, the court rejected the proffered defense not because affirmative, open retirement did not constitute withdrawal, but because the defendant had not fully retired or fully divested his ownership interest in the business. In this case, on the other hand, there is no evidence of any employment or ownership relation existing between Lowell and Atlas after 1971.

Two other cases involving alleged withdrawal by termination of employment are also inapposite, not because defendants did not cease working for the enterprise, but because the heart of the conspiracy in each case was an agreement to conceal facts from the "authorities." *See United States v. Mardian*, 546 F.2d 973, 978 (D.C.Cir.1976); *United States v. Nowak*, 448 F.2d 134, 139–40 (7th Cir. 1971), *cert. denied*, 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 731 (1972).

16. As noted above, the district court directed the jury to acquit Lowell if the call was made after the termination of the conspiracy. Clearly, acquittal would have been required for similar reasons had the call never been made at all.

17. *United States v. Borelli*, 336 F.2d at 388.

18. Given the close factual similarity of this case to *Hyde*, we must similarly reject Lowell's arguments concerning his alleged lack of "a stake in the outcome," arguments that Lowell derives from language in the Second Circuit decisions in *United States v. Di Re*, 159 F.2d 818, 819 (2d Cir. 1947), *aff'd*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), and *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). In each case the Supreme Court affirmed without adopting Judge Hand's "stake in the outcome" language. If indeed a "stake in the outcome" were necessary in any strict technical sense, the evidence here afforded the jury ample means to infer that Lowell had such a stake. For instance, the jury was entitled to conclude that during the life of the conspiracy, Lowell continued to have a stake in its failure to be detected.

er the district court should have awarded a new trial to afford Lowell an opportunity to present to the jury Montalbano's testimony [19] that Lowell never paid him the bribes that Tepperman charged Lowell with paying. Logic compels us to address Lowell's contentions in several stages; but at each stage we conclude that the court committed no reversible error in rejecting the contentions.

### A.

First, we are constrained to conclude that Montalbano's refusal to take the witness stand was privileged. "To sustain a claim of privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Lowell bears a tremendous burden in attempting to persuade this court to overturn the district court's holding,[20] for in a matter such as this, considerable deference must be given the trial judge who " 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' " 341 U.S. at 487, 71 S.Ct. at 818 (citation omitted).

Lowell requested that Montalbano take the witness stand and respond to four questions:

[1] whether he had not admitted receiving payments for and on behalf of Atlas Paint and Varnish; . . . [2] from whom he received those payments . . . [3] whether he ever received cash payments on behalf of Atlas Paint and Varnish from anyone other than Mr. Accamondo, . . . [and 4] how often he had met Arthur Lowell prior to his indictment in this case.

Notwithstanding Montalbano's prior plea of guilty, his counsel appeared before Judge Whipple and invoked the fifth amendment privilege on his client's behalf, claiming that there were other matters to which "he could very well expose himself to jeopardy," including tax evasion and activity in the Southern District of New York where "on many occasions he received items of value from Atlas."

Montalbano's counsel was correct in assuming that Montalbano's activity could form the basis of future prosecutions notwithstanding his conviction on the conspiracy charge. *See, e. g., Pinkerton v. United States*, 328 U.S. 640, 643–44, 66 S.Ct. 1180, 1181–82, 90 L.Ed. 1489 (1946); *see also United States v. Feola*, 420 U.S. 671, 693, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975). Prosecution for tax evasion growing out of Montalbano's receipt of Atlas payoffs remained a possibility. In addition, of course, Montalbano may have been indictable for any payoff schemes he may have participated in apart from Atlas, with or without the participation of Lowell. Thus, had Montalbano testified, he would have run the risk of self-incrimination even if his testimony was truthful and consistent with his prior statements to the FBI and to Judge Stern. On the other hand, if Montalbano's prior statements were untrue, truthful testimony in this trial could have exposed him to perjury charges, in addition to

---

**19.** Because we cannot weigh the probative value of Pionzio's post-trial immunized grand jury testimony on this appeal, the discussion in this part of our opinion must be limited to consideration only of the testimony introduced (or sought to be introduced) at the trial below. We recognize that in a hearing on any future Rule 33 motion directed at the district court, the particular nature of Pionzio's post-trial testimony may require the district court to re-evaluate some of Lowell's claims vis-a-vis Montalbano. *See* Part V *infra*.

**20.** The district court said:

[I]t is this Court's considered opinion that the Fifth Amendment privilege was available to Montalbano. Although Montalbano pleaded guilty to conspiracy, his testimony might well have subjected him to additional federal prosecution on other counts or to state prosecution for offenses arising from the same series of transactions, and thus the privilege remains. *See United States v. Yurasovich*, 580 F.2d 1212, 1218 (3d Cir. 1978); *United States v. Johnson*, 488 F.2d 1206, 1209 (1st Cir. 1973).

490 F.Supp. at 905.

providing additional links in the chain of evidence necessary to uncover the full extent of Montalbano's tax evasion and receipt of bribes. *See, e. g., United States v. Housand*, 550 F.2d 818, 823 (2d Cir.), *cert. denied*, 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977); *United States v. Partin*, 552 F.2d 621, 632 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

Perhaps even more central to the propriety of the trial court's ruling was the certainty that Montalbano would be subject to close cross-examination by the Government. Courts have often recognized the need to prevent coconspirators from "whitewashing" each other through use of testimony unchallengeable for one reason or another. *See United States v. Turkish*, 623 F.2d 769, 775–76 (2d Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 856, 66 L.Ed.2d 880 (1981); *United States v. LaDuca*, 447 F.Supp. 779, 783 (D.N.J.), *aff'd sub nom. United States v. Rocco*, 587 F.2d 144 (3d Cir. 1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). It was vital that the Government have an opportunity effectively to impeach the witness's account of his relationship with Lowell by closely questioning him. Given Lowell's broad contacts in GSA and given the number of contractors with whom Montalbano dealt, however, it would have been impossible for the trial court to conclude that careful questioning would not improve the details of governmental knowledge that might ultimately serve as the basis of prosecutions for tax evasion and receipt of bribes.

Relying on *United States v. Pardo*, 636 F.2d 535 (D.C.Cir.1980), Lowell would have us circumscribe the Government's cross-examination so as not to unduly prejudice Montalbano, thus effecting an accommodation between Lowell's sixth amendment right to procure testimony in his favor and Montalbano's fifth amendment privilege. In *Pardo* the Government prosecuted six men for possession of cocaine and possession with intent to distribute. The evidence against two defendants, Goodwin and Tate, consisted solely of the testimony of undercover agents with respect to the defend-

ants' presence and behavior at the warehouse where the cocaine at issue was to be sold to the agents. These two defendants sought to elicit testimony from co-indictee Corbett who, said Goodwin and Tate, would contradict the testimony of the agent witnesses insofar as it incriminated Goodwin and Tate. Because Corbett had already entered into a plea bargain that effectively immunized him from further prosecution, Goodwin and Tate argued that Corbett could not refuse to testify on fifth amendment grounds. Corbett's counsel, however, "expressed a fear that cross-examination of Corbett might touch upon matters which would provide 'a link or a clue that might well enable the prosecution to charge him with conspiracy in some case where he had a very small part....'" 636 F.2d at 541. The trial court agreed.

The court of appeals reasoned that because Corbett's testimony concerning the events of December 29 could not incriminate him, the only danger posed to his privilege lay in cross-examination. The court then went on to hold that there was sufficient impeaching material with which the Government might confront Corbett, without the need to discuss matters of an incriminating nature. Not only could Corbett answer freely anything concerning events at the warehouse on December 29, he could also answer freely with respect to three separate drug deals in which he had been involved, but in which guilty pleas had removed the threat of further incrimination. As opposed to this, the Government made absolutely no showing that there existed other significant matters for which the fifth amendment privilege would bar cross-examination.

For these reasons, the court opined that the case presented not the typical "painful choice between a defendant's Sixth Amendment right to procure testimony in his favor and a witness' Fifth Amendment right not to incriminate himself. On careful examination," it concluded that the case presented "the less painful conflict between the defendant's Sixth Amendment right to procure testimony and the Government's right

to cross-examine the witness offering the testimony." 636 F.2d at 542 (footnote omitted). Moreover, in balancing the two concerns the particular facts of the case disclosed a dispositive tilt in favor of the decision to require Corbett to testify.

Although the court applied commendable insight in the difficult situation presented in *Pardo*, the same analysis will not help Lowell in this case. The difficulties here are too great to be overcome even by resort to the perceptive analysis laid out by Judge Edwards in *Pardo*. It would be impossible to limit the scope of Montalbano's testimony vis-a-vis Lowell to nonincriminating matters. Those crimes for which Montalbano still faces prosecution were part of the same pattern allegedly begun between Montalbano and Lowell. The only clearly nonincriminating impeaching matter was Montalbano's guilty plea. That, however, revealed nothing tending to impeach the expected testimony regarding the Montalbano-Lowell connection. Any examination of Montalbano's connections with Lowell could thus become links in a chain of evidence leading to Montalbano's subsequent conviction. This is in marked contrast to Corbett's situation in the *Pardo* case. There, the Government's primary task in cross-examining Corbett would have been an attempt to elicit signs of uncertainty and inconsistency in Corbett's recollections of the events at the warehouse on December 29. Such cross-examination would reveal faulty memory or, at most, that Corbett's direct testimony was perjurious. However, neither faulty memory nor expectation of future perjury can render a refusal to testify privileged. *See United States v. Apfelbaum*, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980).

Thus we perceive no way that the trial court could have prospectively limited Mon-

talbano's testimony to matters wholly outside the protection of the fifth amendment's self-incrimination clause. Although the standard we apply is generous to Montalbano, the cases establish that such generosity is inevitable. In *United States v. Coffey*, 198 F.2d 438 (3d Cir. 1952), this court acknowledged the extraordinary degree to which the self-incrimination clause protects witnesses from even the weakest threat of incrimination. *Coffey* was the last of a series of Third Circuit decisions in which this court had initially required various grand jury witnesses to testify to seemingly nonincriminating facts. In each earlier case the Supreme Court had reversed.[21] In *Coffey* this court acknowledged that the controlling Supreme Court precedents entitled witnesses to invoke the privilege even "when there are no additional facts before the Court which suggest particular connecting links through which the answer might lead to and might result in incrimination of the witness." 198 F.2d at 440.[22]

The conclusion drawn in *Coffey* may seem at first glance to afford substantial opportunity for abuse by those without significant fears of "self-incrimination" within the meaning of the fifth amendment. *Cf. United States v. Turkish*, 623 F.2d at 780 (Lumbard, J., concurring and dissenting). However, further reflection shows that an absolute curtailment of abuse is possible only at the risk of substantial curtailment of the constitutional protection of the self-incrimination clause. As Chief Justice Marshall recognized long ago, if the court cannot say that "any direct answer" cannot implicate the witness, then the witness himself

> must be the sole judge what his answer would be. The court cannot participate with him in this judgment, because they

---

**21.** *United States v. Hoffman*, 185 F.2d 617 (3d Cir. 1950), *rev'd*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *United States v. Greenberg*, 187 F.2d 35 (3d Cir.), *vacated and remanded per curiam*, 341 U.S. 944, 71 S.Ct. 1013, 95 L.Ed. 1369 (1951), *on remand*, 192 F.2d 201 (3d Cir.), *rev'd per curiam*, 343 U.S. 918, 72 S.Ct. 674, 96 L.Ed. 1332 (1952); *United States v. Singleton*, 193 F.2d 464 (3d Cir.), *rev'd per*

*curiam*, 343 U.S. 944, 72 S.Ct. 1041, 96 L.Ed. 1349 (1952).

**22.** *Coffey* was "cited with approval in *Emspak v. United States*, 349 U.S. 190 [, 198 n.18, 75 S.Ct. 687, 692 n.18, 99 L.Ed. 997 (1955)]." *Malloy v. Hogan*, 378 U.S. 1, 13 n.9, 84 S.Ct. 1489, 1496 n.9, 12 L.Ed.2d 653 (1964).

cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. *It follows necessarily then,* from this statement of things, *that if the question be of such a description that an answer to it may or may not criminate the witness,* according to the purport of that answer, *it must rest with himself, who alone can tell what it would be, to answer the question or not.*

*United States v. Burr,* 25 F.Cas. 38, 40 (C.C.D.Va.1807) (No. 14,692e) (Marshall, C. J.) (emphasis added). We conclude that the district court committed no error in sustaining Montalbano's refusal to testify. *See also United States v. Johnson,* 488 F.2d 1206 (1st Cir. 1973).

### B.

Lowell asks us to hold that, even if Montalbano has a fifth amendment privilege to refuse to testify, Montalbano should be clothed in some form of immunity for anything he might say while testifying on Lowell's behalf. Lowell seeks such a ruling on the basis of our recent decision in *Government of Virgin Islands v. Smith,* 615 F.2d 964 (3d Cir. 1980); *see generally* Comment, *Defense Witness Immunity and the Right to a Fair Trial,* 129 U.Pa.L.Rev. 377 (1980). *Smith* established two roads by which a defendant could compel that a witness be given immunity. First, where the Government's denial of use immunity to a defense witness is undertaken with the "deliberate intention of distorting the judicial fact finding process," the court can order acquittal unless on retrial the prosecution grants statutory immunity. Second, even in the absence of prosecutorial misconduct, *Smith* opens the door to a nonstatutory order of immunity derived from the defendant's due process right to have exculpatory evidence presented to the jury.

Judge Garth, writing for the panel, drew heavily from *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), where the Supreme Court had found that a state court was obligated by the federal constitution to abrogate its own otherwise reasonable rules of evidence when, in a particular case, the application of the rule effectively denied a defendant due process.

Of crucial significance to the Supreme Court's decision in *Chambers,* was the clearly exculpatory and essential nature of the evidence which was excluded. . . . Similarly, before a court can grant immunity to a defense witness, . . . the defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case. Immunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or if it is found to relate only to the credibility of the government's witnesses. Once the court determines that the defendant has satisfied this threshold burden, the focus then shifts to consideration of the state's countervailing interests, if any.

615 F.2d at 972–73 (footnote omitted).

In *Smith* this court announced the application of a new rule of law to be applied to the facts of that case upon subsequent remand to the district court. Lowell's trial, on the other hand, began one year after the decision in *United States v. Herman,* 589 F. 2d 1191 (3d Cir. 1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979), in which Judge Gibbons wrote an opinion foreshadowing the holding ultimately reached in *Smith.*[23] In addition, although Lowell's trial took place prior to the filing, or argument, of the *Smith* case, the district court had *Smith* before it when it denied Lowell's motion for a new trial. *See, e. g.,* 490 F.Supp. at 905. Thus here, unlike *Smith,*

---

**23.** Because of the date *Herman* was filed, the district court order vacated in *Smith* was entered without the benefit of *Herman's* immuni-

ty discussion. *Government of Virgin Islands v. Smith,* 615 F.2d at 968 n.5.

the district court has already had an opportunity to apply the rule to the evidence. However, it declined to order immunity. Thus, the court's resolution of this issue is entitled to much more deference here than it was in *Smith*. Moreover, the appropriateness of such deference is buttressed by the knowledge that the Montalbano testimony would have had its main impact on the credibility of Tepperman, an issue peculiarly one for the trial court.

We agree that the facts of this case are insufficient to warrant judicial conferral of immunity under the *Smith* rule. In *Smith*, the court was faced with a probable certainty that Sanchez's testimony would exonerate three of the convicted felons. Additionally, it was given absolutely no reason why the U. S. Attorney refused to consent to a grant of immunity by the otherwise willing Virgin Islands prosecutor, even though only the latter would have had the responsibility of deciding whether to prosecute Sanchez. Here, on the other hand, the district court found, and we agree, that the prosecutor's conduct evinced no "deliberate intention of distorting the factfinding process." And we note in support of that conclusion that the prosecution *does* have an arguable reason for denying immunity. For it may yet prosecute Montalbano. Moreover, Montalbano's expected testimony, even if believed, would not *in itself* exonerate Lowell; apparently, Sanchez's testimony alone, if believed, would have required acquittal. Thus, although there are points of congruence between the cases, they do not go to the heart of Judge Garth's reasoning in *Smith*. In view of what Judge Garth recognized as the "unique and affirmative nature of the immunity remedy and fundamental considerations of separation of powers," *Government of the Virgin Islands v.*

*Smith*, 615 F.2d at 971, we decline to extend further the rule announced in *Smith* to cover this factual situation.

## C.

Finally, Lowell argues that he was entitled to read to the jury from the transcript of Montalbano's attempted plea. He contends that, due to Montalbano's "unavailability," the transcript should have been admitted on the ground that it was made at another hearing where "the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1). Here, of course, the prosecutor, although present at Montalbano's plea hearing, had no similar motive or interest. The only motive at the earlier hearing was to assure that the plea was voluntary and that a factual basis existed for the plea. Also, this was primarily the responsibility of Judge Stern, not the prosecutor. Montalbano's implicit denial of receipt of payment from Lowell, even if it were untrue, did not deprive his plea of guilty on the conspiracy charge of a "factual basis." In any case, only Judge Stern examined Montalbano.

Lowell also asserts that Montalbano's statement was admissible because, being contrary to Montalbano's penal interest, it was inherently reliable under Rule 804(b)(5). (Rule 804(b)(3) would afford the statement admissibility on the same basic ground—that it was against Montalbano's penal interest.) This contention is inappropriate. Montalbano's denial of receipt of payments from anyone other than Accamondo was not shown to be against his interest. Moreover, we fail to see how such a showing could be made. Under these circumstances we will not reverse on this ground.[24]

---

**24.** Lowell has also raised several other issues on this appeal that were decided adversely by the district court. They are: (1) misconduct in the summation of the prosecutor's case; (2) a juror's failure to answer truthfully on voir dire whether she or a member of her family had been a victim of a crime; (3) the trial judge's refusal to inquire on voir dire whether any juror might bear religious prejudice against Lowell; and (4) the trial judge's refusal to adopt Lowell's requested jury instruction on the theory of the defense. We have carefully reviewed the record and find nothing to warrant reversal of the district court on these issues. *See* 490 F.Supp. 906–07.

## V.

Lastly, we note that Lowell has brought to our attention post-trial statements made by Pionzio before a grand jury,[25] which, if taken together with Montalbano's pre-trial statements, would constitute a complete contradiction of aspects of Tepperman's testimony that were crucial to the validity of Lowell's conviction.

On September 17, 1980, approximately ten months after Lowell and Pionzio were convicted, Pionzio testified pursuant to a grant of immunity before a grand jury sitting in the District of New Jersey. On November 13, 1980, Judge Whipple ordered the Government to release part of Pionzio's testimony before the grand jury. The released portion of his immunized testimony reads as follows:

Q. Who delivered the payments to you on behalf of Atlas Paint and Varnish?

A. Mike Foncellino.

Q. Did you ever receive any payments from Arthur S. Lowell?

A. No.

Q. Did you ever have any conversations with Arthur Lowell about the investigation of Atlas Paint and Varnish?

A. Atlas Paint and Varnish?

Q. That's correct.

A. No.

 We will take judicial notice that Pionzio has given testimony under a grant of immunity.[26] However, because we find it inappropriate to weigh the probative value of Pionzio's testimony in deciding this appeal, we must reject the motion to supplement the record. *See United States ex rel. Mulvaney v. Rush,* 487 F.2d 684, 687 (3d Cir. 1973). It will be necessary for Lowell to raise this issue, if at all, in an appropriate motion under Fed.R.Crim.P. 33, to be presented in the first instance to the district court. *United States v. Dansker,* 537 F.2d 40, 65 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We cannot simply dismiss the matter, however, without comment on the Government's assertion that the limited matters of which we now take notice are not relevant to any issue raised on this appeal.

As we noted above, it was necessary for the jury to believe that Tepperman spoke the truth when he implicated Lowell in the scheme to make "insurance" payoffs to Montalbano or Pionzio. Assuming both Pionzio's and Montalbano's statements were true, they would cast a great deal of doubt on Tepperman's crucial testimony. Their impact, however, can only be felt by the trier of fact if considered together. Absent Pionzio's testimony, Montalbano's testimony is not sufficiently exculpatory to warrant judicially ordered immunity for Montalbano. Absent Montalbano's testimony, Pionzio's newly given testimony may or may not be sufficiently exculpatory to warrant retrial on the basis of newly discovered evidence.[27]

---

25. Lowell filed a motion in this court for leave to supplement the record with matters he claimed subject to judicial notice, namely, matters pertaining to Pionzio's testimony under a prosecutorial grant of immunity to a federal jury as set forth in the text. We will deny the motion to supplement the record, but our views on the judicial noticeability of the additional matter will be discussed below.

26. Normally, of course, the court of appeals will consider only the record and facts considered in the district court. *See, e. g., Jaconski v. Avisun Corp.,* 359 F.2d 931, 936 n.11 (3d Cir. 1966). However, "[t]he normal rule is subject to the right of an appellate court in a proper case to take judicial notice of new developments not considered by the lower court." *Landy v. Federal Deposit Ins. Corp.,* 486 F.2d 139, 151 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The Government does not dispute the truth of the facts that (a) Pionzio testified and (b) he was given some sort of immunity. Therefore, we perceive no need to refuse to take judicial notice that Pionzio has testified under a grant of immunity.

27. In considering whether to grant a motion for retrial, the ability of Pionzio or the Government to resist Lowell's attempt to use Pionzio's testimony will be subject to criteria different from those applicable to Montalbano's testimony. *Cf. In re Corrugated Container Antitrust Litigation,* 644 F.2d 70, 77 (2d Cir. 1981) (where transcript of witnesses's immunized testimony constituted the source of questions posed to the same witness in a civil proceeding, responsive answers to such questions are unavailable for subsequent prosecutorial use); *accord Appeal of Starkey,* 600 F.2d 1043 (8th Cir. 1979). *But see In re Corrugated Container Antitrust Litigation,* 620 F.2d 1086 (5th

Thus, any hearing before the district court may indeed serve to reopen the questions surrounding Montalbano's refusal to testify, in addition to other questions surrounding the credibility of Tepperman. However, we will not consider these questions in the first instance in this court. Given our disposition of Lowell's claims based on the facts presented to the district court, we could not have ordered a remand during the pendency of this appeal unless the trial court had evidenced a willingness to grant a Rule 33 motion for a new trial. *United States v. Salerno,* 485 F.2d 260, 262 n.2 (3d Cir. 1973), *cert. denied,* 415 U.S. 994, 94 S.Ct. 1596, 39 L.Ed.2d 891 (1974); *United States v. Conway,* 415 F.2d 158, 166 (3d Cir. 1969), *cert. denied,* 397 U.S. 994, 90 S.Ct. 1131, 25 L.Ed.2d 401 (1970); *Richardson v. United States,* 360 F.2d 366 (5th Cir. 1966); *see generally Government of the Virgin Islands v. Josiah,* 641 F.2d 1103, 1105 (3d Cir. 1981); *Zamloch v. United States,* 187 F.2d 854, 856 (9th Cir. 1951). As Lowell did not, apparently, make such a Rule 33 motion during the pendency of this appeal, we have no alternative but to affirm his conviction on the record now before us.

## VI.

Accordingly, the judgment of the district court will be affirmed.

Cir. 1980). Thus, it is not at all apparent to this court that, in any retrial of Lowell, Pionzio could invoke the self-incrimination clause as a ground for refusing to testify for the defense.