**UNITED STATES of America, Plaintiff,**

**v.**

**Arthur S. LOWELL and Anthony Pionzio, Defendants.**

**Crim. A. No. 79–241.**

United States District Court,
D. New Jersey.

May 12, 1980.

---

**900**

K. William O'Connor, John Klein, Spec. Attys., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Nathan Lewin, Steven A. Reiss, Miller, Cassiday, LaRocca & Lewin, Washington, D. C., for defendant Lowell.

William M. Brodsky, New York City, for defendant Pionzio.

## OPINION

WHIPPLE, Senior District Judge.

On November 29, 1979 defendant Arthur S. Lowell was convicted of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Codefendant Anthony Pionzio was convicted of conspiracy and of three counts of violating the Travel Act, 18 U.S.C. § 1952(a)(3). This matter is presently before the Court on motion of defendant Lowell for a judgment of acquittal, or in the alternative for a new trial. Defendant Pionzio joins in several portions of the motion as indicated *infra*.

Defendant Lowell was for some years a business advisor to firms doing business with the General Services Administration (GSA). He was charged as the prime mover in a conspiracy to bribe GSA employees in order to secure favorable treatment for a government contractor, Atlas Paint and Varnish Company (Atlas). Lowell left the employ of the company in 1971, yet the bribery payments continued until 1977. In 1977 Lowell allegedly made a phone call in which he told one Michael Foncellino, an employee of Atlas and an unindicted co-conspirator, to be careful because an investigation of codefendant Pionzio, a GSA employee, was underway. The investigation ended with the indictment of Lowell, Pionzio and Joseph Montalbano, another GSA employee alleged to have taken bribes. Montalbano pleaded guilty. Dennis Tepperman, president of Atlas and another unindicted co-conspirator, was granted immunity from prosecution to become the chief witness for the Government. Foncellino also testified for the Government.

### I. MOTION FOR A JUDGMENT OF ACQUITTAL

At the conclusion of the Government's case the defendants moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a). They grounded their argument upon Judge Prettyman's general analysis in *Curley v. United States*, 160 F.2d 229, 232–33 (D.C.Cir.1947):

> [A] trial judge, in passing upon a motion for a directed verdict of acquittal, must

determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might conclude guilt beyond a reasonable doubt. If he concludes upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it in another way, if there is no evidence upon which a reasonable mind might fairly conclude guilty beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.

After carefully applying this analysis to the Government's case, it was ruled that sufficient evidence had been presented upon which a reasonable minded juror could fairly conclude guilt beyond a reasonable doubt. Therefore, the motions were denied. After the defense presented its case, the jury returned guilty verdicts on all counts of the indictment. Defendants now renew their motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(c).

## A. CREDIBILITY

 The first ground for the motion is the alleged incredibility of the Government's chief witness, Dennis Tepperman. As this Court has previously held, the final decision concerning the believability of Government witnesses rests with the jury. *United States v. Gross*, 375 F.Supp. 971, 973 (D.N.J.1974), *aff'd*, 511 F.2d 910 (3d Cir.), *cert. denied*, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975), *citing United States v. Allard*, 240 F.2d 840 (3d Cir. 1957). *See also United States v. Morris*, 308 F.Supp. 1348, 1351 (E.D.Pa.1970). However, since the trial court was also in a position to view and evaluate the witnesses, in post-trial motions it is appropriate for the Court to re-examine the transcripts and to decide whether the jury's evaluation of the evidence and the resulting guilty verdict constituted a miscarriage of justice. *United States v. Gross, supra*. The Court has conducted such a re-examination, bearing in mind that

in a motion for a judgment of acquittal the evidence must be viewed in the light most favorable to the Government. *United States v. Greenlee*, 517 F.2d 899, 907 (3d Cir. 1975); *United States v. Armocida*, 515 F.2d 29, 46 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Snead*, 447 F.Supp. 1321, 1326 (E.D.Pa.1978). The Court holds that, with respect to the testimony and veracity of Dennis Tepperman, the jury did not stray beyond its proper role as the finders of credibility and fact.

## B. THE STATUTE OF LIMITATIONS

Defendant Lowell asserts a defense based upon the statute of limitations for conspiracy prosecutions. He asserts that he withdrew from the conspiracy more than five years before his indictment, and that his 1977 telephone call advising unindicted co-conspirator Foncellino that codefendant Pionzio was under investigation was by itself insufficient as a matter of law to constitute re-entry into the continuing conspiracy. Lowell's argument has two parts: (1) his split from Atlas Paint & Varnish late in 1971 constituted a withdrawal from the conspiracy as a matter of law, and therefore the jury could not validly have found him to have participated in the conspiracy at any time between 1971 and 1977; and (2) his 1977 telephone call could not as a matter of law have constituted entry or re-entry into the conspiracy. Defendant's brief treats these two issues and the facts which underlie them as if they should be considered separately. For reasons which shall become clear, I analyze the issues and their underlying facts as closely interrelated.

 A conspirator may withdraw from a continuing conspiracy and thereby avoid prosecution for acts committed by remaining members at a later date if he proves that he performed "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators . . ." *United States v. United States Gypsum Co.*, 438 U.S. 422, 464, 98 S.Ct. 2864, 2887, 57

L.Ed.2d 854 (1978); *accord, Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912); *United States v. Continental Group, Inc.,* 603 F.2d 444, 466–67 (3d Cir. 1979); *United States v. Gillen,* 599 F.2d 541, 548 (3d Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); *United States v. D'Andrea,* 585 F.2d 1351, 1355 n.3 (7th Cir. 1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1795, 60 L.Ed.2d 244 (1979); *United States v. Abraham,* 541 F.2d 1234, 1237 & n.3 (7th Cir. 1976); *United States v. Heckman,* 479 F.2d 726, 729 (3d Cir. 1973); *United States v. Nowak,* 448 F.2d 134, 139 (7th Cir. 1971); *United States v. Cantone,* 426 F.2d 902, 905 (2d Cir. 1970); *Glazerman v. United States,* 421 F.2d 547, 551 (10th Cir. 1970); *United States v. Goldberg,* 401 F.2d 644, 649 (2d Cir. 1968), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969); *United States v. Schwenoha,* 383 F.2d 395, 396–97 (2d Cir. 1967); *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The burden of proof as to withdrawal is on the defendant. *See, e. g., Gillen, supra* at 548. Mere cessation of activity is not sufficient to constitute permanent withdrawal as a matter of law. *See, e. g., Continental Group, supra* at 467. Specifically, the Second Circuit, in what remains the leading opinion on withdrawal, has held that a finding that one defendant terminated his association with his co-conspirators outside the period of limitations did not constitute withdrawal as a matter of law if the substantive activity which was the precise object of the conspiracy before his split with the others continued after his split. *Borelli, supra* at 389.

■ In the instant case, although Lowell's termination of his association with Atlas presented a jury issue as to withdrawal, a judgment of acquittal is not required for two reasons. First, as in *Borelli,* the jury heard admissible testimony that the activities which were the object of the conspiracy as it existed prior to Lowell's termination—namely, bribery of GSA officials—continued after his departure, and therefore it could have concluded that his departure

did not by itself amount to complete withdrawal. Second, and more importantly, in considering whether Lowell permanently withdrew, the jury was clearly entitled to consider all of the facts which were proved concerning that defendant, both before and after his departure from Atlas. Thus, the jury was entitled to consider the 1977 phone call as relevant to the question of whether Lowell had permanently withdrawn in 1971. The mere fact that Lowell departed in 1971 and that the Government did not offer proof of overt acts committed by him between 1971 and 1977 does not establish that his participation ended in 1971. *See, e. g., Cantone, supra* at 905. To the contrary, evidence of the 1977 phone call taken with evidence of Lowell's participation prior to 1971 would have allowed the jury to infer that Lowell's withdrawal was only temporary and not, as is required for acquittal, permanent. *See Continental Group, supra* at 467; *D'Andrea, supra* at 1355 n.3; *Abraham, supra* at 1237 n.3; *Heckman, supra* at 729–30; *Nowak, supra* at 139; *cf. Goldberg, supra* at 649 (evidence established that one defendant permanently abandoned conspiracy at a date outside period of limitations; no evidence of any contacts between him and other conspirators thereafter); *Glazerman, supra* at 551–52 (same).

As should be clear from the foregoing, the Court regards evidence of Lowell's 1977 telephone call as relevant to and proper in considering whether Lowell withdrew in 1971. Accordingly, the Court declines to take defendant's approach to that call as it relates to the issue of membership in the conspiracy.

Defendant analyzes the telephone call as if it were the sole peg upon which the Government can hang its claim that Lowell was a member of the conspiracy in 1977. Defendant's argument assumes that Lowell's split with Atlas in 1971 constituted a permanent, legally effective withdrawal from the conspiracy. Defendant then proceeds to argue that the 1977 phone call could not constitute an act of reentry into the conspiracy as it then existed. However, because this Court treats the two events—

the 1971 split and the 1977 phone call—together, it is unnecessary to decide whether the latter event could, in a vacuum, constitute an act of entry into a conspiracy.

Defendant's argument that the phone call is insufficient to make him a member of the conspiracy rests upon a case in which there was no proof that the defendant in question had any connection with the conspiracy prior to the date of the act which arguably constituted entry. *See Roberts v. United States*, 416 F.2d 1216, 1220–21 (5th Cir. 1969). In *Roberts* there was no evidence that defendant Bookout had any involvement with the conspiracy prior to her overhearing a plan to pass counterfeit money and her subsequent destruction of that contraband. However, in the instant case the jury heard testimony of substantial involvement by Lowell prior to the 1977 telephone call, namely in 1969–71. The crucial distinction, then, is that in *Roberts* the court was confronted with the question of whether an individual *as to whom there was no proof of any prior involvement* could be found to have entered a conspiracy solely on proof that she associated with the conspirators and warned and aided one of them; here, on the other hand, the question of whether the phone call, taken alone, could constitute entry into the conspiracy is a red herring, for, as noted above, it assumes that the call was the first act connecting the defendant to the unlawful scheme.

The Court regards as equally inapposite to the issue of the 1977 phone call those cases which state that in order to be found a member of a conspiracy a defendant must in some sense promote the venture himself or have a stake in its outcome. *See United States v. Di Re*, 159 F.2d 818, 819–20 (2d Cir. 1947), *aff'd*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). Defendant's argument is that after 1971 Lowell no longer had a stake in the outcome of the conspiracy, and therefore the 1977 phone call cannot be regarded as an act in furtherance of the conspiracy. Once again, the crucial distinction between defendant's case and the cases of *Falcone* and *Di Re* is that the latter opinions addressed the question of what a complete stranger to a conspiracy must do, as a matter of law, to become a member. There is no suggestion in those cases that in order to convict the Government must show that a defendant continued to have a substantial, active interest in the outcome of the conspiracy throughout its life once it has been proved that at some earlier time the defendant had such an interest. As already noted, temporary cessation of activity related to the conspiracy does not constitute withdrawal.

■ Having concluded that the 1971 split and the 1977 phone call presented a jury issue as to whether defendant Lowell withdrew from the conspiracy in 1971, there remains the question of whether the 1977 phone call could reasonably have been viewed by the jury as an act in furtherance of the conspiracy. The Court concludes that if the jury found on the basis of the 1977 call that the 1971 split was not an effective withdrawal, then the phone call could reasonably be regarded as furthering the object of the conspiracy, namely to pay bribes to GSA employees.

## C. THE CONSPIRACY STATUTE

Defendants[1] also assert that they were wrongly convicted under 18 U.S.C. § 371, because the Government did not prove a conspiracy to defraud the Government. Defendants rely upon *United States v. Porter*, 591 F.2d 1048 (5th Cir. 1979) where the court wrote that when:

> [I]t is conceded that the Government has not been subjected to any property or pecuniary loss by the activities set forth in the indictment, the conspiracy count can stand only if the Government can point to some lawful function which has been impaired, obstructed, or defeated.

*Id.* at 1056 (footnote omitted).

In *Porter* the convictions of two doctors and a laboratory operator under 18 U.S.C. § 371 were reversed. However, the circumstanc-

---

1. Defendant Pionzio joins in this portion of the motion.

es were unique and distinguishable. *Porter* involved medicare monies. Under medicare rules and regulations an automated blood testing laboratory received $35.00 while a manual laboratory received $214.00 for the same blood testing service. Defendant Porter ran a manual laboratory and paid the doctors who sent samples to his laboratory a "handling fee" of up to $35.00 for each sample. The theory of prosecution was that the "handling fee" was in fact a bribe or kickback. The Court noted that:

> [D]espite the fact that it paid no sums of money in excess of the amounts authorized for blood tests in the Miami area, that it suffered no loss of its property or money, that no materially false statement were filed, *that no public officials were bribed or participated in the scheme,* and that no statute or regulation required that doctors send the blood samples to automated labs, the government insists that it has been defrauded by this alleged conspiracy.

*Id.* at 1055 (emphasis added).

The obvious factual difference between *Porter* and the case at bar is that the conspiracy here involved the bribery and/or participation of government officials, namely GSA employees.

■ *Porter* is distinguishable for another reason. The case holds that, in order to convict, a defendant's conduct must plainly and unmistakably fall within the proscription of 18 U.S.C. § 371, as that statute was construed in *Hammerschmidt v. United States,* 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924):

> 'To conspire to defraud the United States means primarily to cheat the government out of property or money, but *it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those*

*charged with carrying out the governmental intention.'*

*Porter, supra* at 1055, (emphasis added), *quoting Hammerschmidt, supra,* 265 U.S. at 188, 44 S.Ct. at 512.

In *Porter* no official action of the government was defeated because the $214.00 would have been paid to the manual blood testing laboratory operator regardless of whether he paid some of it back to the referring doctors; accordingly, the convictions were reversed. Here the governmental purpose of the GSA is in part to secure maintenance materials in a lawful competitive manner. Even in the absence of proof of a governmental pecuniary loss, it is clear that the defendants' activities undermined a lawful function of the GSA.

Defendants' three grounds for a judgment of acquittal, taken separately or considered cumulatively, fail to provide the necessary basis to grant the motion.

## II. MOTION FOR A NEW TRIAL

■ Alternatively, defendants move for a new trial "in the interests of justice" pursuant to Fed.R.Crim.P. 33. Motions under Rule 33 are addressed to the sound discretion of the trial court and are granted sparingly. *United States v. Iannelli,* 528 F.2d 1290, 1292 (3d Cir. 1976); *United States v. Snead, supra; United States v. Odom,* 348 F.Supp. 889, 893 (M.D.Pa.1972), *aff'd,* 475 F.2d 1397 (3d Cir.), *cert. denied* 414 U.S. 836, 94 S.Ct. 182, 38 L.Ed.2d 72 (1973). In order to prevail, the defendants face a heavy burden after a jury verdict because, as in a motion for judgment of acquittal, the evidence must be viewed in the light most favorable to the government. *United States v. Greenlee, supra* at 902; *United States v. Armocida, supra* at 46; *United States v. Snead, supra* at 1326. As this Court has previously held:

> [A] jury's verdict . . . is entitled to presumptive validity and the trial court should exercise its authority in this area very sparingly and only in the most exceptional cases where it is convinced that a gross injustice will have been done if it fails to act.

*United States v. Gross, supra* at 973–74. In considering a motion for a new trial, the verdict must be sustained if there is substantial evidence to support it. *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Continental Group Inc., supra* at 449. Once again the evidence must be viewed in the light most favorable to the government.

## A. WITNESS IMMUNITY

The first ground asserted in support of the motion for a new trial is that co-conspirator Montalbano, who pleaded guilty prior to Lowell's trial, should have been granted immunity to testify on Lowell's behalf. In support Lowell argues: (1) Montalbano had no valid Fifth Amendment privilege; (2) the Court erred when it did not order the Government to grant immunity to Montalbano; (3) the Court erred when it refused to grant Montalbano "judicially fashioned immunity"; and (4) the Court erred when it refused to admit into evidence statements made by Montalbano during his prior plea proceeding pursuant to Fed.R.Evid. 804(b)(1).

■ First, it is this Court's considered opinion that the Fifth Amendment privilege was available to Montalbano. Although Montalbano pleaded guilty to conspiracy, his testimony might well have subjected him to additional federal prosecution on other counts or to state prosecution for offenses arising from the same series of transactions, and thus the privilege remains. *See United States v. Yurasovich*, 580 F.2d 1212, 1218 (3d Cir. 1978); *United States v. Johnson*, 488 F.2d 1206, 1209 (1st Cir. 1973).

■ As to defendant Lowell's second contention, the Court finds guidance in *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980), which delineated the requirements for statutory immunity. The Third Circuit held that this remedy is conditioned upon a showing by defendant that the Government's decision not to provide immunity was a decision made "with the deliberate intention of distorting the judicial factfinding process." *Id.* at 968.

Absent this type of prosecutorial misconduct, statutory immunity cannot be granted. *Id.* at 968.

■ Having reviewed the record, I find no prosecutorial misconduct. The Government had a legitimate prosecutorial basis for refusing immunity due to the fact that Montalbano was exposed to further federal prosecution, either as a result of incriminating testimony given at trial or following a successful attempt to withdraw his guilty plea. Because of this prosecutorial interest, I find no deliberate intention of the Government to distort the judicial factfinding process.

■ *Smith* also establishes the Third Circuit's criteria for judicially conferred immunity:

[I]mmunity must be properly sought in the district court; the defense witness must be available to testify; the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interest which countervails against a grant of immunity.

*Id.* at 972.

The proffered testimony in the case at bar is not clearly exculpatory. The anticipated testimony that Montalbano received payments from an Atlas employee other than defendant Lowell was substantially presented to the jury through the testimony of Government witness Accamando. Also, the possibility that Montalbano might never have received payments from Lowell does not necessarily imply that Lowell did not make payments to others. Thus, the proffered testimony fails to meet the threshold requirement of "clearly exculpatory".

Furthermore, as previously stated, the Government had a legitimate interest against granting immunity due to Montalbano's exposure to further federal prosecution. The defendant Lowell therefore fails to meet another threshold requirement established in *Smith*.

■ Lastly, the Court rejects defendant Lowell's argument that Montalbano's prior

testimony should have been read into evidence pursuant to Fed.R.Evid. 804(b)(1). That rule requires that the party against whom the testimony is offered must have had "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination [at the prior hearing]." However, at the plea hearing, the Government had neither the opportunity nor a motive to develop Montalbano's statement by extensive cross-examination.

## B. PROSECUTORIAL MISCONDUCT

Defendants [2] assert that in his summation the prosecutor improperly stated that a potential witness, Sidney Freedman, was "deceased", when in fact Mr. Freedman was alive. Earlier in the trial the Government attempted to introduce a transcript of statements made by Freedman to an FBI agent. The transcript was not permitted into evidence because Mr. Freedman was unavailable for cross-examination, ostensibly because he was living in Florida and was extremely ill.

■ By affidavit the prosecution maintains that in his summation he referred to the individual as diseased, not deceased. The court reporter transcribed "deceased", and the prosecutor concedes that he may have made the misstatement. Although defense counsel made objections during the Government's summation, no objection was made to the alleged misstatement. Alleged instances of prosecutorial misconduct must be the subject of an objection at trial in order to be raised in a motion for a new trial. *United States v. Gross, supra,* 375 F.Supp. at 978, *citing United States v. Somers,* 496 F.2d 723 (3d Cir. 1974); *United States v. Lawson,* 337 F.2d 800, 807 (3d Cir. 1964), *cert. denied,* 380 U.S. 919, 85 S.Ct. 913, 13 L.Ed.2d 804 (1965). Assuming *arguendo* that the prosecutor made the misstatement, the point may not now be raised by defendants. Moreover, if the point could be raised, defendants' suggestion that the jury necessarily assumed that Freedman would have testified for the

Government is unwarranted. Such a conclusion about the jury's thoughts is pure speculation.

## C. JUROR NONDISCLOSURE

■ As another ground for a new trial defendants [3] argue that one juror's failure to answer truthfully a voir dire question as to whether she or any member of her family had ever been the victim of a crime is likely to have been prejudicial to their case. This alleged failure came to light when one of the alternate jurors informed the Court that prior to the start of deliberations he heard Ms. Florio, one of the regular jurors, stating to other jurors that her mother had been the victim of a crime.

These circumstances do not approach the level of fundamental unfairness constituting a denial of due process or raising the specter of a Sixth Amendment violation. The event in question was remotely connected in time to the instant trial and, in any case, has no relation to the nature of the crimes of which defendants were convicted. The cases which defendants cite simply do not support the claim that a new trial is warranted on these facts. *See Government of the Virgin Islands v. Bodle,* 427 F.2d 532, 533–34 (3d Cir. 1970); *United States v. Cavell,* 287 F.2d 792, 797–98 (3d Cir.), *cert. denied,* 366 U.S. 944, 81 S.Ct. 1672, 6 L.Ed.2d 855 (1961); *United States v. McCorkle,* 248 F.2d 1, 6–9 (3d Cir.), *cert. denied,* 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957).

## D. RELIGIOUS PREJUDICE

■ As another reason for ordering a new trial defendant Lowell points to this Court's refusal to ask a voir dire question concerning prejudice any juror might bear against him on account of the fact that he is Jewish. The Court simply does not regard voir dire questions concerning religious or ethnic bias as required in order to guarantee defendants a fair trial, for, unlike race, religion or ethnicity is not imme-

---

**2.** *See* note 1, *supra.*

**3.** *See* note 1, *supra.*

diately and unmistakably obvious. *Cf. United States v. Williams,* 612 F.2d 735, 736 (3d Cir. 1979) (race); *United States v. Robinson,* 485 F.2d 1157, 1159–60 (3d Cir. 1973) (race).

### E. DEFENSE INSTRUCTIONS

█ Finally, defendant Lowell asserts that it was error for the Court to decline the defendants' instruction on the theory of defense. A theory of defense instruction was given to the jury, though not in the form as requested by defense counsel. A district court is "bound to give the substance of a requested instruction relating to any defense theory for which there is any foundation in the evidence." *United States v. Blair,* 456 F.2d 514, 520 (3d Cir. 1972). However, "[i]t is well-settled that there is no error to refuse to instruct as counsel wishes *if the charge to the jury is correct." Id.* (emphasis added). The Court stands by the instructions as given.

### F. COSTS

█ Also before the Court is a motion by the Government to tax the costs of prosecution against defendants. This matter is within the Court's discretion. *United States v. Pommerening,* 500 F.2d 92, 101–02 (10th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 678, 42 L.Ed.2d 680 (1974). The motion is denied.

Attorneys for the Government shall submit an order in accordance with this opinion within seven (7) days.