### UNITED STATES of America

#### v.

**Harvey Keith SAMPSON a/k/a Kenneth Earl Ball, Rose M. Sampson, James A. Fehir, a/k/a Monk, Bruce R. Thomas, a/k/a Melon, Glenda Fehir.**

**Crim. No. 87–45.**

United States District Court,
W.D. Pennsylvania.

June 3, 1987.

Linda L. Kelly, Asst. U.S. Atty., Pittsburgh, Pa., for plaintiff.

Kim Wm. Riester, Pittsburgh, Pa., for defendant Harvey Keith Sampson.

G. William Bills, Pittsburgh, Pa., for defendant Rose Sampson.

John J. Hodacsek, Jr., Beaver Falls, Pa., for defendant James A. Fehir.

James K. O'Malley, Pittsburgh, Pa., for defendant Bruce R. Thomas.

Paul M. Goltz, Pittsburgh, Pa., for defendant Glenda Fehir.

## MEMORANDUM OPINION

DIAMOND, District Judge.

Defendant Rose Sampson has moved this court to confer judicial immunity on her husband and co-defendant, Harvey Keith Sampson. In connection with this motion, Rose Sampson has also filed a motion to sever. For the reasons that follow, we hold that this case is one where judicial immunity is particularly inappropriate, and we deny defendant's motions.

### Background

Rose and Harvey Sampson, along with three other co-defendants, are charged, *inter alia*, with conspiracy to distribute, possession with intent to distribute, and distribution of cocaine. *See* 21 U.S.C. §§ 841(a)(1), 846. These charges arise out of an aborted cocaine transaction on January 31, 1987, prearranged by undercover Drug Enforcement Agents and concluded with the defendants' arrest. The court has conducted three hearings in this case: a hearing on the government's appeal from the magistrate's bail order, a bail revocation hearing for defendant Rose Sampson, and a suppression hearing. Drawing from these hearings, we will recount the evidence relevant to Rose Sampson's motion.

Beginning on January 24, 1987, Special Agent Alexander Schiraj of the Drug En-

forcement Agency ("DEA"), working with a confidential informant, negotiated with defendant Bruce Thomas for the purchase of one-half kilogram of cocaine. Thomas was to obtain the cocaine from co-defendant James Fehir. Fehir, also known as "Monk," owned Monk's Auto Body Shop in Conway, Pennsylvania, and Thomas owned a tatoo parlor in the same building.

Eventually, Thomas disclosed that Fehir's source was driving to Pittsburgh from the South with the cocaine. On January 29, 1987, Thomas told the confidential informant that the source arrived with the cocaine only that night because the source experienced mechanical difficulties with the Volvo that he was driving and encountered delay in obtaining parts for the repair. On January 30, Thomas talked to Special Agent Schiraj and notified him that the deal would take place the next day, January 31.

On January 31, Special Agent Schiraj met with the approximately fifteen other agents and officers who would be involved in the surveillance and arrest. He informed them of the impending deal. They agreed to exchange information during the course of the day by radio and phone.

At 11:00 A.M. on January 31, officers surveying Monk's Auto Body Shop observed Harvey Sampson and Rose Sampson arrive there in a silver Volvo. A white Trans Am was parked in front of the shop. At 12:50 P.M., Harvey Sampson left in the silver Volvo, followed by Rose Sampson in the white Trans Am and James Fehir in a brown Capri. The Sampsons and Fehir soon separated.

During the course of the day, negotiations continued between the confidential informant and Bruce Thomas. Because Thomas had told Agent Schiraj that Fehir and his source did not want to meet with Shiraj, the informant was equipped with a transmitting device. Agents Brenda Clarke and John Guseman listened in the car to the transmission's emanating from the informant's transmitting device and broadcast their description of them to the other agents and officers. At 1:40 P.M. the informant met with Thomas and Fehir in a K-Mart parking lot in Moon Township, Pennsylvania. There, they gave the informant a small sample of cocaine. Fehir told the informant that he did not have the one-half kilogram at that time; he was to contact his source shortly to obtain it. According to Fehir's instructions, the informant should contact Fehir at home to receive further instructions on where and when the deal was to take place.

At 2:45 P.M., the Sampsons met with Fehir outside Pappan's restaurant in Rochester, Pennsylvania. Harvey Sampson left the Volvo and met with Fehir in Fehir's car, while Rose Sampson remained in the Trans Am. The Sampsons left the meeting in their two cars and together drove to various places in Rochester, stopping and meeting with several people.

At about 6:20 P.M., Harvey and Rose Sampson parked in front of the Kaufmann's Department Store in Beaver. Rose Sampson parked the Trans Am directly behind Harvey Sampson's Volvo. The Sampsons' eleven-year old daughter, Melissa, sat in the passenger seat of the Trans Am.

Agents in several cars observed the Sampsons through binoculars from approximately one hundred fifty yards away. Night had fallen. Harvey and Rose Sampson got out of their cars. Both walked to the trunk of the Volvo. Pennsylvania State Troopers Chiappini and Shoop saw Harvey Sampson take a white package from the trunk and hand it to Rose Sampson. The troopers radioed this information to the other surveillance cars. DEA Agent Scheid observed Harvey Sampson hand a gun to Rose Sampson while both stood at the Volvo's trunk. Agent Scheid had not seen the transfer of the white package. Some moments after Rose Sampson got back into the Trans Am, Harvey Sampson approached the driver's side of the Trans Am. Rose Sampson, who was in the driver's seat, handed him a gun through the window.

Harvey Sampson drove off in the Volvo to a Kentucky Fried Chicken parking lot, about two hundred yards away, where he met with Fehir and the confidential informant. They haggled over the details of the

deal: the informant wanted to see the cocaine before paying, and the defendants demanded the money first. At some point, one of the defendants said to the informant, "It's in the Kaufmann's lot." Agent Clark heard this statement relayed by the informant's transmitter, and Clark told her partner John Guseman, who relayed it by radio to the other cars. Shortly thereafter, James Porter, the agent in charge, ordered the agents and officers to arrest the defendants. Harvey Sampson was arrested in the Kentucky Fried Chicken parking lot, ten feet from the Volvo. Almost simultaneously, other agents surrounded Rose Sampson's Trans Am. They took her and her daughter from the car. On the back floor, Special Agent Schiraj found a blue duffel bag containing a white powder wrapped in clear plastic. Though the white powder was not visible from outside the duffel bag, the duffel bag was unzipped. It opened at Agent Schiraj's touch, disclosing its contents. Other agents searched Rose Sampson and seized $24,000.00 in cash from her purse. Two guns were found in Harvey Sampson's Volvo.

Later that day, while in custody, Rose Sampson made several statements. She denied knowledge of the drug deal. She stated that she was in the Rochester, Pennsylvania, area to pick up her Trans Am, which had been repaired there. She acknowledged that the purse containing the $24,000.00 was hers and that she knew there was a lot of money in it, though she did not know how much. She said that the money belonged to her husband. Rose Sampson denied knowing what the blue duffel contained, and she said the bag was her husband's.

After the suppression hearing, counsel for Rose Sampson made a detailed proffer of what Harvey Sampson's testimony on Rose Sampson's behalf would be if the court immunized him. Harvey Sampson and his counsel were present in court during this proffer, and Rose Sampson's counsel conferred with them several times to confirm the description of the prospective testimony.

Harvey Sampson would testify that Rose Sampson did not know that a cocaine deal was to take place and she did not know that the blue duffel bag in the Trans Am contained cocaine. According to the proffer, Rose Sampson made the trip to Pennsylvania from South Carolina at her husband's insistence. Her trip was not coerced, however. Harvey Sampson gave Rose Sampson the $24,000.00 in South Carolina. During the trip Harvey never mentioned drugs or a drug deal to Rose. Harvey Sampson would deny that he handed a white package and a gun to Rose in the Kaufmann's parking lot. He did hand her something; the proffer did not specify what it was. Instead, the cocaine was put into the duffel bag in the Trans Am some twenty minutes before the arrest, without Rose Sampson's knowledge.

### Discussion

In *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir.1980), the Court of Appeals announced a rule of fundamental fairness requiring a trial court to immunize a potential defense witness "when it is found that [he] can offer testimony which is clearly exculpatory and essential to the defense case and when the government has no strong interest in withholding use immunity."[1] *Id.* at 974. We hold that this case does not merit such "extraordinary relief." *Id.* at 968. Nevertheless, because we think that Rose Sampson's motion presents a serious question about the scope of *Smith* and its effect on the administration of justice, we will discuss at some length *Smith* and its application to this case.

### A. Judicial Use Immunity

In *Smith*, the Court of Appeals held that under the Due Process Clause, a court should grant use immunity to a defense witness who refuses to testify for fear of

---

**1.** Rose Sampson does not allege, nor does the record insinuate, prosecutorial misconduct that would justify an order compelling the government to grant Harvey Sampson statutory use immunity, as opposed to judicially-fashioned immunity. *See Smith,* 615 F.2d at 968–969; *United States v. Herman,* 589 F.2d 1191 (3d Cir.1978).

self-incrimination when the following five requirements are met:

> [I]mmunity must be properly sought in the district court; the defense witness must be available to testify; the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity.

*Id.* at 972. The Court emphasized that use of this judicial power must be "clearly limited." [2] *Id.* To understand these limitations, we must examine the "totally bizarre situation," *United States v. Turkish,* 623 F.2d 769, 773 (2d Cir.1980), involved in *Smith.*

At their trial for the assault of Roy Phipps, Glen Smith and two co-defendants sought to introduce the testimony of Ernesto Sanchez. Sanchez had confessed to the police that he, along with three people other than the co-defendants at issue in *Smith,*[3] assaulted Phipps. *Id.* at 966–67. Sanchez refused to testify, invoking his privilege against self-incrimination. *Id.* at 967. The government successfully opposed admission at trial of his statement to the police. *Id.*

The Virgin Island Attorney General's office was amenable to granting Sanchez use immunity, but, out of courtesy, conditioned that grant on the consent of the United States Attorney. *Id.* As Sanchez was a juvenile, only the Attorney General of the Virgin Islands had jurisdiction to prosecute or immunize him. *Id.* at 974. Without offering any explanation, the United States Attorney refused to consent. *Id.* at 967, 969. In addition, the United States Attorney sequestered Sanchez prior to trial and denied the defense access to him. *Id.* at 967 n. 3.

To the Court of Appeals, these facts reeked of prosecutorial misconduct done "with the deliberate intention of distorting the judicial factfinding process." *Id.* at 968. The Court held that under the standard enunciated in *United States v. Herman,* 589 F.2d 1191 (3d Cir.1978), these facts would entitle the defendants to a judgment of acquittal unless the government consented to grant statutory use immunity to Sanchez. *Id.* at 969. Alternatively, however, the Court fashioned a type of judicial, non-statutory immunity "triggered, not by prosecutorial misconduct or intentional distortion of the trial process, but by the fact that the defendant is prevented from presenting exculpatory evidence which is crucial to his case." *Id.* Recognizing the unique nature of this immunity and its potential interference with the prerogatives of the Executive branch, *id.* at 971, the Court conditioned conferral of this immunity on a defendant's making a "convincing showing" as to the five requirements listed above. *Id.* at 972.

First, the defendant must properly seek immunity in the district court. *Id.* Second, the witness must be available to testify but for his assertion of privilege. *Id.* Both of these requirements appear clear and easy to apply.

Third, the testimony must be "clearly exculpatory," and, fourth, it must be "essential to the defendant's case." *Id.* Beyond excluding ambiguous and cumulative testimony and testimony that bears only on the credibility of government witnesses, the Court did not define the terms "clearly exculpatory" and "essential." However, the facts of *Smith* and *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), upon which the Court

---

**2.** *Smith* remains the law in the Third Circuit, and we follow it, despite dicta by the Supreme Court that "[n]o court has authority to immunize a witness," *Pillsbury Co. v. Conboy,* 459 U.S. 248, 261, 103 S.Ct. 608, 616, 74 L.Ed.2d 430 (1983); *see United States v. Perry,* 788 F.2d 100, 116 (3d Cir.1986) (distinguishing *Pillsbury*); *United States v. Pennell,* 737 F.2d 521, 527 n. 5 (6th Cir.1984) (rejects *Smith,* but notes that *Pillsbury* "does not control this question"); and despite the refusal of every other court of appeals that has decided the issue to follow *Smith.*

*See United States v. Pennell,* 737 F.2d 521, 527 (6th Cir.1984); *United States v. Hunter,* 672 F.2d 815, 818 (10th Cir.1982); *United States v. Thevis,* 665 F.2d 616, 639–40 (5th Cir.1982); *United States v. Turkish,* 623 F.2d 769 (2d Cir.1980).

**3.** One of the three that Sanchez implicated was Glen Smith's co-defendant Elvis Smith. The Court of Appeals excluded Elvis Smith from its discussion.

of Appeals relied, and *United States v. Lowell*, 649 F.2d 950 (3d Cir.1981), suggest that the testimony must be much more than evidence that has some tendency to negate an element of the government's case.

In *Smith*, Sanchez' potential testimony amounted to a confession of his guilt that would have cleared the defendants of any involvement in the crime. Sanchez had already confessed to the police. Nothing in the circumstances of that confession indicated that he was motivated by a desire to exculpate Smith and his co-defendants. As a statement against penal interest, Sanchez' statement seemed reliable. Moreover, the Court noted that the government's case at trial was weak. It rested almost entirely on the testimony of the victim, who was slightly retarded. At times, his testimony was confusing and incomprehensible. *Id.* at 969 and n. 6. Thus, not only would Sanchez' testimony have been devastating to the government's case, it appeared necessary to prevent a miscarriage of justice.

In *Chambers*, state evidentiary rules prevented defense counsel from cross-examining a witness who had confessed to the homicide with which the defendant was charged, but who later repudiated his confession. The trial judge also excluded the witness's out of court confession. Under the state's proof at trial, only one person could have participated in the homicide. Corroborating circumstances assured the reliability of the confession. 410 U.S. at 300–301, 93 S.Ct. at 1048. As in *Smith*, the government's case was weak. *See* 410 U.S. at 289, 93 S.Ct. at 1042. In light of all these circumstances, the Supreme Court held that the trial court's rulings deprived the defendant of due process. *See also Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (exclusion of separately tried co-defendant's confession at the penalty phase of a capital murder trial violated due process, particularly because the state used the co-defendant's confession at his own trial to convict him and sentence him to death).

In *United States v. Lowell*, 649 F.2d 950 (3d Cir.1981), the defendant, who was accused of a bribery conspiracy, sought immunity for an official who would have testified that the defendant never paid him the bribes that the government's main witness, the only witness who tied the defendant to the conspiracy, charged the defendant with paying. The Court of Appeals upheld the district court's denial of immunity. This testimony would not have been "clearly exculpatory" because it would not have completely exonerated the defendant; it did not exclude the possibility that the defendant made payments to other officials. *See* 649 F.2d at 965; 490 F.Supp. 897, 905 (D.N.J.1980). In distinguishing *Smith*, the Court of Appeals characterized the facts in *Smith* as presenting "a *probable certainty* that Sanchez's testimony would exonerate three of the convicted felons." 649 F.2d at 965. (emphasis added).

■■■ The facts and reasoning of these cases strongly suggest that a defendant is entitled to immunity for his witness only when to deny it would result in a fundamentally unfair trial. We should not immunize testimony that, though exculpatory, has only "some conceivable effect" on the outcome of the trial. *Cf. Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In *Smith*, to define a defendant's due process right to present evidence, the Court of Appeals drew from cases dealing with the right to counsel. 615 F.2d at 971 (discussing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). Thus, we believe that the proper definition of "clearly exculpatory" should resemble the test for prejudice used in an ineffective assistance of counsel claim:

> The defendant must show that there is a reasonable probability that, but for [the unavailability of the witness's testimony], the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068; *compare Lowell*, 649 F.2d at 965 (defendant must make a con-

vincing showing of "probable certainty" that the witnesses's testimony would exonerate him). In applying this standard, we should consider the trustworthiness of the evidence that the defendant offers. In the analogous situation where a defendant seeks severance so that a co-defendant may testify in his behalf, the Court of Appeals for the Third Circuit has urged district courts to weigh "the degree to which the testifying co-defendants could be impeached." *United States v. Boscia,* 573 F.2d 827, 832 (3d Cir.1978).[4]

■ Even after clearing these hurdles, however, a defendant may obtain judicial immunity for a witness only "if no strong governmental interests ... countervail against a grant of immunity." *Smith,* 615 F.2d at 972. We do not interpret this statement to mean that once a strong governmental interest has been identified we should weigh it against the defendant's need for the testimony. Rather, the existence of a strong opposing governmental interest that cannot be accommodated, *see Smith,* 615 F.2d at 973, forbids any weighing and any judicial immunity. *See United States v. Turkish,* 623 F.2d 769, 776–777 (2d Cir.1980).

We base this conclusion on the reasoning of *Smith* and *Lowell.* In *Smith,* the Court recognized the danger that judicial immunity could offend considerations of the separation of powers. *Id.* at 971, 973; *see also Herman,* 589 F.2d at 1204. However, in *Smith,* the United States Attorney had "absolutely no reason," *Lowell,* 649 F.2d at 965, to withhold his consent to immunity; he lacked any jurisdiction over the prospective witness. In discussing *Chambers,* the *Smith* court noted that in that case, "the state had *no* interest in the rigid enforcement of its evidentiary rules." 615 F.2d at 972 n. 10 (emphasis added); *see Chambers,* 410 U.S. at 296–97, 302, 93 S.Ct. at 1046, 1049; *cf. Crane v. Kentucky,* —— U.S. ——, ——, 106 S.Ct. 2142, 2145, 90 L.Ed.2d 636 (1986) ("We have never questioned the power of states to exclude evidence through application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted.").

Subsequently, in *Lowell, supra,* the Court of Appeals deferred to a governmental interest that was "arguable." 649 F.2d at 965. The witness for whom the defendant sought immunity had already pled guilty. He was not a co-conspirator in the bribery scheme, but a recipient of the bribes. The mere "possibility" that the government would prosecute the witness in the future for tax evasion, coupled with the fact that his testimony would not *"in itself* exonerate" the defendant, made *Lowell* an inappropriate case for judicial immunity. *Id.; see also United States v. Bazzano,* 712 F.2d 826, 845 (3d Cir.1983) (Seitz, J., concurring) (In *Lowell,* "this Court ... held that the possibility that a defense witness may be subject to future prosecution is a legitimate reason for denying him immunity.").

Based on *Smith* and *Lowell,* we conclude that only when an alleged governmental interest is "merely formal" or "possibly suspect," *see Smith,* 615 F.2d at 973, may

---

**4.** We do not, and need not, decide the meaning of "essential" in the context of this case. In *Smith,* the court simply said that evidence that is cumulative is not essential. 615 F.2d at 972. We may assume that the court intended "essential" to have the common meaning of "necessary, indispensable." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 777 (1981). Here, there is an obvious substitute for Harvey Sampson's testimony: the testimony of Rose Sampson. In fact, she is the only witness who can offer direct evidence on what will be the dispositive issue at her trial—her knowledge. *See* p. 18, *infra.* However, the Court of Appeals' opinions leave us uncertain whether we may consider the availability of the defendant's testimony in deciding how essential the witness's testimony is. In *Smith,* the force of the witness's testimony lay in his admission of his own guilt; though the defendants could deny their participation in the crime, they could not implicate anyone else. *See* 615 F.2d at 970. In *Lowell,* however, the defendant could, just as well as the witness, testify that he had never paid the witness money, yet the Court of Appeals never mentioned this fact in its opinion. Fortunately, we need not speculate on how the "essential" element applies to this case, for we can adequately consider and dispose of Rose Sampson's motion by reference to the other requirements set forth in *Smith.*

we grant immunity. If the governmental interest is legitimate and strong, we have no recourse but to deny the defendant's motion.

### B. *Application*

■ Rose Sampson has properly sought immunity here, and Harvey Sampson would testify if immunized. However, his testimony would not be "clearly exculpatory" under the standards we have elaborated. Rose Sampson's need for his testimony must bow to the compelling governmental interests against immunity in this case.

If believed, Harvey Sampson's testimony would debilitate the government's case against Rose Sampson. That she came to Pittsburgh only at his insistence and that no mention of a drug transaction passed between them imply that she was unaware of her co-defendant's evil designs. If Harvey Sampson placed the cocaine in Rose Sampson's car a scant twenty minutes before the arrest, the argument that she did not discover the cocaine before the arrest becomes more probable. He claims to have an innocent, albeit unspecified, explanation for the transaction between him and Rose Sampson in the Kaufmann's parking lot that the government claims to have been the exchange of cocaine and a gun.

Nonetheless, even if believed, Harvey Sampson's testimony would not completely exonerate his wife. The evidence would still show that she knowingly carried in her purse an extraordinary amount of cash from South Carolina to Pittsburgh. She accompanied her husband on his meetings with his co-defendants and his ramble from place to place and meeting to meeting on January 31. For twenty minutes, cocaine in an unzipped duffel bag lay on the back floor of her car. Even Harvey Sampson admits that immediately before he departed for the Kentucky Fried Chicken parking lot to consummate the drug deal, he and Rose exited their cars and exchanged something. Then she waited. Unlike *Smith*, this is not a case in which the witness's admission of guilt, if credited, necessarily excludes any possibility of the defendant's guilt. *See Smith*, 615 F.2d at 970.

From this evidence, a jury probably could infer her guilt for conspiracy, *see United States v. Leon*, 739 F.2d 885 (3d Cir.1984); *compare United States v. Gaviria*, 740 F.2d 174 (2d Cir.1984); or for possession with the intent to distribute, *see United States v. Reese*, 561 F.2d 894 (D.C.Cir. 1977). If she had the proper *mens rea*, Rose Sampson's behavior certainly implicated her in the conspiracy. Harvey Sampson cannot testify as to this dispositive issue, his wife's state of mind. *See* Fed.R. Evid. 704(b); S.Rep. No. 225, 98th Cong., 1st Sess. 231, reprinted in U.S.Code Cong. & Admin.News 1984, pp. 3182, 3413 (Rule 704(b) prohibits a witness from offering a conclusion as to a defendant's *mens rea*); *United States v. Phillips*, 600 F.2d 535, 538–39 (5th Cir.1979) (agent should not have been permitted to testify to the defendant's knowledge and understanding).

At its crucial point—the exchange in the Kaufmann's parking lot—Harvey Sampson's testimony would raise an issue of credibility. As in *Lowell*, the defense witness denies a critical transaction that the government witness claims took place. In *Lowell*, the Court of Appeals characterized evidence raising such a conflict as bearing on credibility rather than being clearly exculpatory. 649 F.2d at 965. The agents and officers would testify that they saw Harvey hand a white package and a gun to Rose, who shortly gave the gun back to Harvey. Harvey would maintain that whatever was transferred, it was not cocaine and a gun. Here, the officers' distance from the defendants and the darkness subjects their testimony to attack; different, more sweeping attacks could be made on Harvey Sampson's testimony.

Harvey Sampson's credibility is questionable. He is a convicted felon. At the time of his arrest, he was a fugitive. His account of the exchange in the Kaufmann's parking lot is vague and unconvincing. Most important, the person he seeks to exculpate is his wife. A husband's love for his wife has inspired more infamous sins than perjury. *See, e.g.*, Milton, PARADISE LOST, Book IX, lines 896–916.

Finally, the governmental interests opposing immunity for Harvey Sampson are overwhelming. The indictment charges the Sampsons with participation in a single conspiracy. For the sake of the government—and the courts—participants in a single conspiracy ordinarily should be tried together. *See United States v. Jackson*, 649 F.2d 967, 973 (3d Cir.1981). Harvey Sampson's testimony would incriminate himself. Were we to allow Harvey Sampson to testify under a grant of immunity, we must sever his trial from Rose Sampson's. *Cf. Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Extending *Smith* to this case would not further truth and justice, but obfuscation and injustice. Harvey and Rose Sampson are not only alleged partners in crime, but husband and wife. More than in most conspiracy prosecutions, we should be cautious of empowering a co-conspirator to give his confederates "an immunity bath." *See Smith*, 615 F.2d at 973 (citations omitted). While it is beyond our authority as a trial court to propound a general rule forbidding the application of *Smith* to co-defendants jointly indicted for a single crime, we find persuasive the warnings of the Court of Appeals for the Second Circuit against applying *Smith* to this situation:

> [T]here is considerable force to the Government's apprehension that defense witness immunity could create opportunities for undermining the administration of justice by inviting cooperative perjury among law violators. Co-defendants could secure use immunity for each other, and each immunized witness could exonerate his co-defendant at a separate trial by falsely accepting sole responsibility for the crime secure in the knowledge that his admission could not be used at his own trial for the substantive offense. The threat of a perjury conviction, with penalties frequently far below substantive offenses, could not be relied on to prevent such tactics. Moreover, this maneuver would substantially undermine the opportunity for joint trials, with consequent expense, delay, and burden upon disinterested witnesses and the judicial system.

*United States v. Turkish*, 623 F.2d 769, 775–776 (2d Cir.1980).

### Severance

Rose Sampson has moved to sever her trial from her husband's so she could present his testimony at her trial. As Rose Sampson's motion to immunize Harvey Sampson fails, so, too, must her motion to sever. *See United States v. Stout*, 499 F.Supp. 605 (E.D.Pa.1980). Harvey Sampson's testimony would be exculpatory, but without immunity, he is unlikely to testify on Rose's behalf. He could be impeached extensively. Judicial economy calls for a single trial for a single conspiracy. Thus, under the standard set forth in *United States v. Boscia*, 573 F.2d 827 (3d Cir.1978), Rose Sampson's motion to sever will be denied.

### Conclusion

For the reasons we have stated, Rose Sampson's motions for judicial immunity and severance will be denied.

An appropriate order will follow.